(96 South. 487)

# In re OPINIONS OF THE JUSTICES.

## In re AMENDMENT TO SECTION 93 OF THE CONSTITUTION.

### No. I.

(Supreme Court of Alabama. June 1, 1923. Minority Response, June 9, 1923.)

*(Syllabus by the Justices.)*

1. **Constitutional law ⚖═69—Courts ⚖═208— Advisory Opinion Act constitutional, but opinions are by justices individually and are not binding on them nor on departments or officers.**

Advisory Opinions.—The act "to provide for obtaining the opinions of the Justices of the Supreme Court. or a majority thereof, by the Governor or either House of the Legislature, upon important constitutional questions," contemplates merely advisory opinions of the individual Justices, not of the court, binding neither the Justices nor the department or officer requesting the opinion; and is not invalid as being an encroachment by one department upon the powers of another.

2. **States ⚖═148—May issue bonds for port improvements authorized by constitutional amendment.**

Issuing Bonds.—Under an amendment to section 93 of the Constitution of Alabama (1901), providing that the state may, at a cost of not exceeding $10,000,000, engage in port improvement, the state is authorized to issue bonds in the amount stated.

3. **States ⚖═115—Indebtedness for port improvements authorized by constitutional amendment not subject to prior limitations.**

Indebtedness of the State.—Under said amendment the state may incur an indebtedness of not exceeding $10,000,000 for port development, notwithstanding section 213 of the Constitution of 1901.

The following attorneys, as amici curiæ, filed briefs with the Justices:

Cabaniss, Johnston, Cocke & Cabaniss, of Birmingham, Jesse F. Hogan, of Mobile, James J. Mayfield, of Montgomery, E. G. Rickarby, H. Pillans, and Stevens, McCorvey. McLeod & Goode. all of Mobile, Horace Stringfellow and William C. Swanson, both of Montgomery, and R. V. Taylor, of Mobile.

Chambers of the Justices,

June 1, 1923.

To the Governor,

Hon. Wm. W. Brandon, State Capitol:

The following communication, formulated and presented as the Advisory Opinion Act purports to authorize, has been received by the Justices. The questions propounded have been considered with the most thorough care by the Justices signing the responses to be stated to the questions thus propounded by you:

"State of Alabama, Executive Department.

"Montgomery, February 20, 1923.

"To the Honorable, the Justices of the Supreme Court of Alabama—Gentlemen:

"Under and by virtue of an act of the present session of the Legislature, approved February 15, 1923, 'To·provide for obtaining the opinion of the Justices of the Supreme Court, or ·a majority thereof, by the Governor or. either House of the Legislature, upon important constitutional questions,' I deem it advisable to request your opinion or opinions on the following questions, to wit:

"First. Can the state of Alabama be 'authorized by appropriate laws passed by the Legislature' to issue state bonds to an amount not exceeding ten million dollars, to enable it to 'engage in the work of internal improvement, of promoting, developing, constructing, maintaining and operating all harbors or seaports within the state or its jurisdiction,' as is provided by the last amendment to section 93 of the Constitution of Alabama, which amendment was adopted and proclaimed to be a part of the Constitution of Alabama on November 22, 1922?

"Second. Can the state of Alabama be 'authorized by appropriate laws passed by the Legislature' to incur an indebtedness not exceeding ten million dollars, in order to 'engage in the work of internal improvement, of promoting, developing, constructing, maintaining and operating all harbors or seaports within the state or its jurisdiction,' as is provided in the last amendment to section 93 of the Constitution of Alabama, which amendment was adopted and proclaimed to be a part of the Constitution of Alabama on November 22, 1922?

"Third. Does section 213 of the Constitution of Alabama prohibit the state from incurring debts or issuing bonds, not·exceeding ten million dollars, to enable it to 'engage in the work of internal improvement, of promoting, developing, constructing, maintaining, and operating all harbors or seaports within the state or its jurisdiction,' as is provided in the last amendment to section 93 of the Constitution of Alabama, which amendment was adopted and proclaimed to be a part of the Constitution of Alabama on November 22, 1922?

"Fourth. Is the amendment to section 93 of the Constitution of Alabama, as referred to in the preceding questions, within the limitations or prohibition of section 213 of the Constitution against the state incurring debts?

"In conformity with the foregoing statute approved February 13, 1923, I respectfully request you gentlemen to state to me your opinion or opinions on the questions above mentioned, as soon as may be convenient to your honors.

"I am, with great respect,

"Your most obedient servant,

"Wm. W. Brandon, Governor."

The undersigned Justices respectfully reply in the affirmative to the questions designated first and second in, the communication reproduced ante, and in the negative to the questions designated third and fourth in the communication reproduced ante. The considerations and grounds inducing the

categorical responses made to the several questions propounded are set forth in the opinion which, by direction of the Justices signatory thereto, has been prepared by Justice McCLELLAN to express their judgments in the premises.

### The Advisory Opinion Act.

· The specific questions, propounded by the Governor, reproduced in the foregoing responses made by a majority of the Justices, in their individual capacities, are the first to be propounded under the act (approved February 13, 1923) "to provide for obtaining the opinion of the Justices of the Supreme Court, or a majority thereof, by the Governor or either House of the Legislature, upon important constitutional questions."

It was aptly observed in Norwood v. Goldsmith, 168 Ala. 224, 234, 53 South. 84, 87, that—

"All persons or officers are of necessity required to pass upon the validity of all acts * * * under which they are required to act or to decline to act. In so acting or declining to act * * * he must necessarily pass upon it for himself."

In the exercise of this necessary, tho obviously nonconcluding function (Norwood v. Goldsmith, supra), the Justices—in their individual capacities only, not as the means for the expression of the judgment of the Supreme Court of Alabama—have considered the act with respect to its proper construction and effect as well as to its constitutional validity.

Apart from the title already quoted, the act reads:

"Be it enacted by the Legislature of Alabama: "Section 1. The Governor by a request in writing, or either House of the Legislature by a resolution of such House, may obtain written opinion of the Justices of the Supreme Court of Alabama, or a majority thereof, on important constitutional questions and

"Sec. 2. The opinion of the Justices of the Supreme Court herein provided for shall not be binding upon the state or any department thereof, nor even upon the departments requesting it, or the Justices giving the opinions; but such opinions shall be advisory merely. The object and purpose of this act, being to give more confidence and assurance to the validity and constitutionality of important acts or contemplated acts of the Governor and the Legislature, and to declare the public policy of the state as to requesting and giving opinions of the Justices of the Supreme Court as herein provided.

"Sec. 3. The Justices of the Supreme Court may request briefs from the Attorney General, and may receive briefs from other attorneys as amicus curiæ, as to such questions as may be propounded to them for their answers.

"Approved Feb. 13, 1923."

[1] Interpreting the act according to its manifest effects, these conclusions must, of necessity, prevail: (a) That the act does not at all contemplate the advice or the advisory opinions of the Justices upon any matter relating to the wisdom, desirability, or policy of prospective legislative or executive action; (b) that the merely advisory opinions contemplated are those of the individual Justices, not of the Supreme Court of Alabama in its judicial capacity; (c) that specific inquiries, within the intent of the act, must involve or concern concrete, important constitutional questions upon matters or subjects of a general public nature, as distinguished from questions involved in the ascertainment or declaration of private right or interest; (d) and that responses to questions within the purview of the act are designed to be advisory, consultative only, not concluding or binding the Governor or the House or Houses propounding inquiries or the Justices responding thereto.

The act avows its own object and purpose to be "to give more confidence and assurance to the validity and constitutionality of important acts or contemplated acts of the Governor and the Legislature, and to declare the public policy of the state as to requesting and giving opinions of the Justices of the Supreme Court as" in the act provided. In aid of the public service contemplated the Justices are authorized to request briefs from the Attorney General and to receive briefs from attorneys intervening amicus curiæ.

Since the Legislature possesses the power to prescribe and to define the authority, duties, and functions of the Governor and the Justices (except as restrained by the Constitution), the act invests the Governor and the Houses with the authority to obtain the advisory opinions of the Justices or a majority of them—in respect of "important constitutional questions," propounded as the act contemplates—and imposes upon the Justices an obligation to consider such questions as emanate from the sources the act defines; but the determination of the inquiry, whether the question or questions so propounded are within the stated purview of the act, is an inquiry addressed to and determinable alone by the Justices exercising, each for himself, his judgment upon the inquiry whether the question or questions properly propounded are within the purview of the act. Such questions as are thus determined to be within the purview of the act should and will be accorded appropriate response by the Justice or Justices so concluding.

The performance by the Justices of the function the act contemplates is nonjudicial; this for the obvious reason that advisory opinions given do not conclude or vindicate any right or remedy, result in no judgment or decree, bind no one whatsoever. Laughlin v. Portland, 111 Me. 486, 90 Atl. 318, 15 L. R. A. (N. S.) 1143, Ann. Cas. 1916C, 739; Opinion of Justices, 126 Mass. 566.

The preservative and conservative practice of obtaining the merely "advisory opinions" of the Judges, as a precautionary measure against invalid executive or legislative action or inaction contemplated, had its inception centuries ago in England (see 126 Mass. pp. 561 et seq. for satisfactory historical statement); and varying provisions therefor in the Constitutions of Massachusetts, Maine, New Hampshire, South Dakota, Colorado, Florida, and Rhode Island afford illustrations of the idea's appropriation to the methods of government prevailing in the states enumerated. The recent (1917–19) reordination in Massachusetts of the pertinent provision in that organic law accords the practice an uninterrupted existence in that state since 1780, upwards of 140 years. Other states have retained similar provisions for scores of years. In 1881, without either constitutional sanction or legislative authority the Judges of the Kentucky court of last resort responded to a constitutional question propounded by the Governor. See Opinion of Judges of Court of Appeals, 79 Ky. pp. 621–633. In the '80's the Missouri Constitution was so amended as to eliminate its provision for "advisory opinions"; and Vermont recently repealed its statute (enacted in 1864) establishing the practice there. In 1885 Colorado amended its Constitution so as to require "advisory opinions" from the Supreme Court itself. In Minnesota the act requiring "advisory opinions" of the "Supreme Court or one or more of the Judges thereof" when requested by either branch of the Legislature, was held violative of that state's Constitution, and was hence void. In re Senate of State, 10 Minn. 78 (Gil. 56). The ground of the decision there made is at variance with constitutional principles established here by the illuminating opinion of Justice Head in Fox v. McDonald, 101 Ala. 51, 13 South. 416, 21 L. R. A. 529, 46 Am. St. Rep. 98, to which we will later more particularly refer. In re Workmen's Compensation Fund, 224 N. Y. 13, 119 N. E. 1027, involved a statutory attempt to authorize the State Industrial Commission, "in its discretion to certify to such Appellate Division of the Supreme Court, questions of law. * * *" The object there was to evoke the judgment of a department of the Supreme Court, not the advisory opinions of individual Justices thereof as is the design of the Alabama act under consideration; and this, as the Court of Appeals held, upon a nonjudicial question. The New York Court appears to have proceeded from the premise that the Constitution of New York restricted the exercise of judicial functions to "controversies" between litigants; and concluded that, under the organic law of New York, "the Legislature is [was] without power to charge the courts with the performance of nonjudicial duties."

The purpose, design and effect of our Advisory Opinion Act being as stated, the inquiry is whether the act is offensive to the Constitution of Alabama? If the act is offensive to the Constitution of this state, then it is, of course, invalid, and the Governor is without authority to propound to the Justices any questions thereunder, and, in consequence, no degree of obligation rests upon the Justices to consider questions propounded by the Houses or the Governor.

Is the act constitutionally valid? As in all cases involving the constitutional validity of legislative enactments, they are regarded as presumptively valid, and the wisdom, policy, or propriety thereof are not factors for consideration in determining their freedom from offense to the organic law. State ex rel. v. Greene, 154 Ala. 249, 254, 46 South. 268; Fairhope Corporation v. Melville, 193 Ala. 289, 305, 306, 69 South. 466, citing earlier pronouncements. The public policy and design manifested and adopted through this Advisory Opinion Act concludes every person and every department of the state with respect to the wisdom and propriety of the subject-matter of the act. In Sheppard v. Dowling, 127 Ala. 1, 6, 28 South. 791, 793 (85 Am. St. Rep. 68), the statement of established principle was:

"That this court is thoroughly committed to the doctrine that the Constitution of the state, and the Constitution of the United States so far as it has any application, are not the sources of the legislative power residing in the General Assembly of Alabama, nor in any sense grants of power to the Legislature, but only limitations upon that power, and that, apart from the limitations imposed by those fundamental charts of government, the power of the Legislature has no bounds and is as plenary as that of the British Parliament. All which the General Assembly is not forbidden to do by the organic law, state or federal, it has full competency to do."

The only sections of the Constitution of 1901 that are thought to contain provisions the Advisory Opinion Act might offend are sections 42 and 43. These sections read:

"Sec. 42. The powers of the government of the state of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

"Sec. 43. In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."

These sections distribute the powers of government to three distinct departments,

and prohibit the exercise of one department of powers expressly or by necessary implication referred to another department, except in instances expressly directed or permitted. Section 43 is addressed to departmental restraint, differing, materially, from the provisions of section 2 of article 3 of the Constitution of 1875, where the prohibition against the exercise of power belonging to either of the other departments, was addressed to a "person, or collection of persons, being of one of" the other departments. Under the just-mentioned provisions of the Constitution of 1875, the inhibition was written in terms referable to persons or collections of persons; whereas the organic law of 1901 (section 43) directs its restraint to the departments as such. The report of the committee on preamble, etc., in the convention framing the present organic law (Journal, p. 361), referring to section 38 of the report (now section 43 of the Constitution of 1901), characterized it (38) as a "new section, prohibiting the exercise by one department of the government of any of the functions of either of the other departments." Doubtless the drafting of the "new section" and the omission of already quoted section 2 of article 3 of the Constitution of 1875 was the result of the very instructive discussion given by Justice Head in Fox v. McDonald, 101 Ala. 51, 13 South. 416, 21 L. R. A. 529, 46 Am. St. Rep. 98. The inquiry there under consideration was whether the Legislature could validly confer on the judge of probate—a judicial officer—the power to appoint police commissioners for the city of Birmingham. This question evoked the court's consideration and construction of the pertinent provisions of section 2 of article 3 of the Constitution of 1875. The presently important pronouncements of constitutional law made in Fox v. McDonald, supra, were accurately stated in headnotes 2, 3, and 4 as follows:

"2. *Distribution of powers.*—All powers which are, by the Constitution itself, expressly or by necessary implication, referred to the exclusive exercise of one of the several departments of the government, must be exercised by that department, and cannot be, by legislation, conferred elsewhere."

"3. *Nature of powers conferred not determinative of the department by which they are to be exercised.*—The fact that certain powers and duties conferred by legislation partake of a legislative, executive or judicial nature, is not determinative of the department of the government by which such powers and duties are to be exercised."

"4. *Same.*—The constitutional provision in regard to the distribution of the powers of government into three departments, and forbidding the exercise by an officer of one department of any act properly belonging to another, 'was not intended to declare that every act pertaining to government, and the regulation of the social and property rights of the citizen, should be exercised exclusively by the legislative, executive, or judicial department, or some member of it, according as the act possessed a legislative, executive, or judicial character.' "

At the risk of unnecessary repetition it is to be observed that, in unmistakable effect, it was declared that even under the terms of section 2, art. 3, of the Constitution of 1875—addressed as it was to "persons or collections of persons" belonging to other departments—the organic law of 1875 only restricted departmental functions to spheres prescribed in the Constitution, leaving to legislative selection, creation, and discretion the means. including personnel, wherewith governmental functions outside of those assigned by the Constitution to a particular department, officer, body, or functionary might be performed; and the further pronouncement was that the nature of the function contemplated by an enactment did not restrict, excluding other departments, the department to which the function or duty might be assigned for performance, unless the function or duty sought to be conferred or imposed by the enactment was expressly or by necessary implication in the Constitution referred to the "exclusive exercise" of a particular department or officer.

The Constitution contains no reference, express or implied, to advisory, consultative opinions by the Justices. Since the giving of such opinions by the Justices is not "the exercise of a judicial function," it is manifest that an act establishing this preservative practice is not the imposition of a judicial duty, or any character of detraction or subtraction from the distinctiveness and immunity from encroachment our Constitution assures to the judicial department. It results, necessarily, from the doctrine established through Fox v. McDonald, supra, that the Legislature is not restrained from imposing or conferring upon a judicial officer, in his individual capacity as such, nonjudicial duties or functions.

If, however (for the occasion only), the proposition is accepted that the practice of requiring merely advisory, consultative opinions of the Justices upon important constitutional questions is a function "judicial in nature," the provision to be quoted from section 139 of the Constitution of 1901 effects to directly authorize the Legislature to impose the stated duty and to regulate its performance; the judicial power (otherwise than therein prescribed) of the state may be exercised "by such persons as may be by law invested with powers of a judicial nature"; the Constitution being silent with respect to this particular function, viz.: The giving of merely advisory opinions upon request of the Executive or the Houses of the Legislature. The effect of this provision was to clothe the Legislature with authority to invest persons

—selected, without limitation in respect of personnel, as the Legislature in its discretion might conclude—with power judicial in nature. It is to be particularly observed that this authorization (section 139) was not confined to "such persons" as belong to neither the executive nor legislative departments of state or who belong to the judicial department. There is significant omission from the provision of the word "other" in the phrase, "or such persons as may be by law invested" with power of a judicial nature; and this omission confirms the idea that the makers of the Constitution intended to repose in the lawmaking department the discretion to invest "such persons" as it chose with powers of "a judicial nature" that the organic law itself did not vest, exclusively, in some governmental agency, body or officer. In State ex rel. v. Burke, 175 Ala. 567. 57 South. 872, of the expression under consideration these pertinent observations were made:

"Section 139 of the Constitution which names or prescribes the tribunals in which the judicial power of the state shall be vested names the Senate sitting as a court of impeachment, the Supreme Court, and circuit, chancery, probate, and such inferior courts as the Legislature may establish; and concludes by adding the phrase, 'and such persons as may be by law invested with powers of a judicial nature,' with certain conditions as to the establishment of such inferior courts, not here important to be discussed. The quoted and italicized provision of section 139 of the Constitution first appeared in the Constitution of 1875. Since the Constitution of 1875, the Legislature has had this express authority for conferring certain parts of the judicial power of the state—heretofore conferred or conferrable only upon the tribunals or courts mentioned or provided for in the previous Constitutions of 1819, 1861, and 1865 —upon certain designated persons."

Of this provision in section 139 it was said, in response on rehearing in State Tax Com. v. Bailey & Howard, 179 Ala. 630, 60 South. 916:

"Section 139 of the Constitution of 1901 not only vests the judicial powers of the state in the officers therein enumerated, but also in such persons as may be by law invested with powers of a judicial nature. Our present Constitution not only permits the Legislature to create a State Tax Commission, but authorizes it to be invested with judicial powers."

If the function prescribed in this act is nonjudicial in nature, the Constitution does not forbid its imposition upon or performance by individual officers who are "of the judicial department"; and, if, on the other hand, it is conceived that the function prescribed in this act is of a "judicial nature," then its imposition upon or performance by individual officers who are "of the judicial department" is not offensive to any provision of the Constitution. Const. § 139; State ex rel. v. Burke, 175 Ala. 561, 57 South. 870.

Does this act, the preservative practice created thereby, manifest an effort or design to delegate, to subordinate, to qualify, or to detract from, the legislative or executive power or authority the Constitution of 1901 distinctively assigns to those departments of state?

The purpose and effect of the act compels a negative response to the stated inquiry. As has been observed, this act constitutes the Justices, in their individual capacities, the advisors, only, and alone when requested thereunder, of the Houses and the Governor in respect of "important constitutional questions" that those agencies of government encounter or anticipate in the performance or discharge of the functions of government. Neither the act's design nor its effect is to invest the Justices with any character or quality of veto power. In terms the act characterizes as completely inconclusive and inconcluding the responses contemplated. It provides:

"The opinion of the Justices * * * shall not be binding upon the state or any department thereof, nor even upon the departments requesting it, or the Justices giving the opinions; but such opinions shall be advisory merely."

The sources seeking the advice the practice intends are those charged with governmental duty; and this with respect to the observance of the Constitutions, federal and state; to obey and observe which, as the highest laws, it is the oath-bound duty of all to do. The act does not intend that Justices volunteer their advice. The Justices can only respond when requested thereunto by one of the Houses or by the Governor. If a House or the Governor do not desire the advice of the Justices, there is no obligation to propound a question to the Justices. If the response or responses, made as the act contemplates, do not commend themselves to the propounder of the question or questions, the House or the Governor is not required, in any degree, to accept or heed the advice thus elicited by them from the Justices. No legislative or executive function, power, or authority is or is sought to be by the act reposed in the Justices. Their function is "advisory merely"; inconclusive and inconcluding upon the questioner, the responder, or any department, person, or officer. Obviously, in these circumstances, the act manifests no effort, establishes no effect to qualify, delegate, or subordinate, or to detract from any power or function with which the Constitution has invested either the legislative or executive departments or any officer or body attached to those departments.

The argument is advanced that this act offends either section 42 or 43, or both, quoted ante, through or by its effect to invoke, in advance of contestation, the opinions of the Justices, whose judgments become the voice

of the Supreme Court of Alabama, of which they are members, in causes or proceedings brought within that court's constitutionally defined judicial power. Such was the view found acceptable in the response of the Minnesota court. 10 Minn. 78 (Gil. 56). It is to be noted that the statutory requirement for opinions there sought to be made was as broad as the law itself, viz. "upon a given subject"; and was exacted of the court itself and, alternatively, of the Judges. The responsive opinion, declaring the enactment void, was "by the court." The inquiry, the court remarked, was "communicated to the court yesterday." The court treated the enactment as constituting "the Supreme Court the advisers of the Legislature, nothing more." While alluding to the alternative exaction, the enactment made of the Judges, the court reprehended the expression of opinion, by either court or Judges, in advance of appropriately invoked, authoritative consideration and adjudication by the court; thereupon, forthwith, without other invocation of the judicial function then exercised than a resolution of the Senate, declared, with judicially pronounced finality, the enactment unconstitutional and void; and that it "therefore imposed [imposes] no duty *on the court*." (Italics supplied.) The enactment there considered did not confine the questions propoundable, as does the act under consideration, to "important constitutional questions"; questions, of that character, projected by the supreme, organic laws that all are expressly required to observe, to obey. It seems that the real basis of the court's conclusion, apparently so hastily attained, was that the Legislature in Minnesota could not confer or impose either upon a court or a judicial officer the performance of a nonjudicial function or duty; a doctrine inconsistent with the constitutional principles pronounced in Fox v. McDonald, supra, as shown by the accurate headnotes thereto reproduced ante. It is not to be supposed that the view prevailing with the Minnesota court (10 Minn. 78 [Gil. 56]) would have prevailed if that court had had under consideration a Constitution like Alabama's present organic law, and had found sound and acceptable the construction this court accepted and ably maintained in Fox v. McDonald, supra. The same observations are applicable to expressions in Re Workmen's Compensation Fund, 224 N. Y. 13, 119 N. E. 1027.

There are several reasons why the practice of invoking the merely advisory opinions of the Justices, in their individual capacities, cannot and will not operate to invite the Justices to prejudge concrete causes or proceedings that may later come to the Supreme Court for decision: First. Such merely advisory opinions must often pertain to important constitutional questions that never can or will come to the Supreme Court's consideration and decision; this, to illustrate, in all cases where the Legislature or the Executive does no act projecting or raising the constitutional inquiry upon which an advisory opinion or opinions have been requested and given. Second. Since only one prejudiced by official act or action can invoke the courts to judicially determine a constitutional question, it cannot be at all certain that the subject of such advisory opinion will be presented for judicial determination in a cause or proceeding in the courts. Third. The decision by the Supreme Court upon the constitutional validity of a legislative enactment or of an act by the Executive always contains this important factor that is wholly absent in a response by the Justices to a request for a merely advisory opinion on the question, pending legislative or executive action, namely, that in judicially testing and determining the constitutionality of legislative or executive action the Supreme Court —in the discharge of its high and concluding judicial function—always enters upon such an inquiry with the presumption, suggested by the deference due from one department to another, that the other department has not ignored or violated the Constitution; and this judicial presumption requires the sustaining of legislative or executive act, unless its invalidity appears beyond a reasonable doubt. In the observance of the practice, this act establishes, responses by the Justices would not at all involve recourse to or recognition of the stated presumption pending action by the interrogator on the subject of the advice sought. In these circumstances, no evoking of the judgment of the Justices in advance of contestation of any constitutional question in the Supreme Court itself is or would be effected by the practice the act establishes.

Since the exercise by the Legislature, through this act, of its discretion to create the Justices, in their individual capacities only, mere advisers on "important constitutional questions," manifests no offense to or violation of any provision of the Constitution, criticism of the choice of personnel made by this act, for the performance of this nonconcluding function, is referable, alone, to a matter of wisdom or policy that the act, itself, concludes. Neither the Legislature nor the Executive have or enjoy any prerogative to ignore or violate the Constitutions. Indeed, obedience to the Constitutions' provisions must be regarded as the desire, the purpose and intent of every department and officer in the government. The practice thus established evinces the highest permissible form of precautionary procedure to preserve constitutional government by invoking the advice of those thought to be peculiarly qualified to give, in advance of action, advice in respect of the Constitution's prescriptions; thereby manifesting a quickening sense of

responsibility for submission and conformity to the Constitutions on the part of all who owe that supreme duty to the governments.

The undersigned Justices, in their individual capacities, therefore, conclude that the Advisory Opinion Act is not violative of the Constitution of Alabama; and, having attained this conclusion, proceed to state the grounds upon which categorical responses are given to the questions propounded by the Governor under date of the 20th day of February, 1923.

The Questions Propounded by the Governor.

[2, 3] The inquiries propounded by the Governor may be well resolved into this question of constitutional construction: Has section 93 of the Constitution been so altered by the so-called Port Amendment—ratified as an amendment of amended section 93 in 1922—as to except seaport improvement from the general prohibition expressed in section 213 of the Constitution against the state's creation or incurring of a "new debt," with presently unimportant exceptions therein prescribed? Within this more comprehensive statement of the inquiry is this question of constitutional construction: Has section 93 of the Constitution been so altered by the adoption of the Port Amendment as to except seaport improvement from the inhibition of section 93 against the state's lending money or its credit in aid of that character of internal improvement?

The solution of these questions, the major as well as the more acute inquiries stated, requires, primarily, the construction of section 93 as it is now, after the change that was wrought by its alteration through the Port Amendment in 1922; and, then, the determination of the effect, if any, of the present section 93 upon the general prohibition in section 213 against the incurring by the state of a "new debt" otherwise than as permitted in section 213.

Before its amendment, first in 1908, section 93 of the Constitution of 1901 read:

"Sec. 93. The state shall not engage in works of internal improvement, nor lend money or its credit in aid of. such; nor shall the state be interested in any private or corporate enterprise, or lend money or its credit to any individual, association, or corporation."

The financial profligacy with which reckless officials had, prior to the Constitution of 1875, created obligations of the state induced the incorporation in that organic law of the general prohibition expressed in section 213 and the particular, the comprehensive inhibitions expressed in original section 93. Except as restrained by the Constitutions, federal and state, the Legislature's power and authority is plenary (Sheppard v. Dowling, 127 Ala. 1, 6, 28 South. 791, 85 Am. St. Rep. 68); and, hence, if the fiscal affairs of the state were to be preserved from misadventure, mismanagement, and improvidence it was considered necessary and desirable that the legislative power should be restrained through the inclusion in the Constitution of definite, unmistakable prohibitions against governmental act or action to which the depleted, if not bankrupt, condition of the state's finances was naturally attributable in view of the then (1875) practically current events, and their well-appreciated consequences to the menace of the state's financial welfare. Both the state's engaging in works of internal improvement or lending its money or credit in aid thereof and the state's extensions or grants of its credit or assurances in the promotion of private or corporate enterprises had contributed to the public conviction that was given avowal in what became, in 1901, sections 93 and, in general, more comprehensive terms as to debts, without presently important material change, 213 of the Constitution.

Original section 93 was a simple, clear prohibition against the state's doing the things prescribed therein. Its provisions were inhibitory only; a denial of power or authority to engage in such works; to lend the state's money or credit in aid of or to the designs, purposes or ends specified therein. In 1907–8, the people of the state determined to except, tho only partially, from the inhibitory effect of original section 93 the public roads, an internal improvement that otherwise would have been within the prohibition of the original section; and, also in 1908, section 93 was effectually amended by the addition to the original provisions of the terms italicized in this reproduction of section 93 as it was amended:

"Section 93. The state shall not engage in works of internal improvement nor lend money or its credit in aid of such, nor shall the state be interested in any private or corporate enterprises or lend money or its credit to any individual association or corporation, *provided that the state may under appropriate laws cause the net proceeds from the state convict fund to be applied to the construction, repair and maintenance of public roads in the state, and the Legislature may also make additional appropriations for that purpose.*"

It is to be noted that the exception of public roads from the prohibitory provisions of original section 93 was restricted to the first prohibition in the section, namely, against the state's engaging in works of internal improvement; the sources from which the means to improve, etc., the public roads being so defined and limited as to exclude recourse to the credit of the state in any form or to otherwise afford the means than through funds of the state subject to appropriation. So, in 1908, the thus amended section 93 became "to all intents and purposes" a part of the Constitution (Const. 1901, § 284); and this was the content of the section (93) when the Legislature of 1919 formulated and sub-

mitted to electoral judgment the first (so-called) Port Amendment. Gen. Acts 1919, pp. 908, 909. The proposal then submitted was defeated at the polls. At the special session of the same Legislature in 1921 (see Laws 1921, p. 1) an amendment was again proposed containing the authorization of seaport improvement, with the added feature of a limitation on the cost thereof. This proposal was adopted, and is now "to all intents and purposes" a part of the Constitution. Const. § 284. It reads:

"Sec. 93. The state shall not engage in works of internal improvement, nor lend money or its credit in aid of such, except as may be authorized by the Constitution of Alabama or amendments thereto; nor shall the state be interested in any private or corporate enterprise, or lend money or its credit to any individual, association, or corporation, except as may be expressly authorized by the Constitution of Alabama, or amendments thereto; but when authorized by laws passed by the Legislature the state may appropriate funds to be applied to the construction, repair, and maintenance of public roads, highways, and bridges in the state; and when authorized by appropriate laws passed by the Legislature, the state may at a cost of not exceeding ten million dollars engage in the work of internal improvement, of promoting, developing, constructing, maintaining, and operating all harbors or seaports within the state or its jurisdiction, provided, that such work or improvement shall always be and remain under the management and control of the state, through its state Harbor Commission, or other governing agency. The adoption of this amendment shall not affect in any manner any other amendment to the Constitution of Alabama which may be adopted pursuant to any act or resolution of this session of the Legislature."

The proposal of 1921 was a revision in structure and, partially, in terms of the former proposal of 1919. Among the changes made was the omission from the proposal of 1921 of the proviso, in that of 1919, whereby "the foregoing prohibitions" were declared inapplicable to the seaport improvement contemplated, thus exempting that particular character of improvement from the prohibitions, reiterated as from original section 93, against the state's engaging in works of internal improvement or lending its money or credit in aid thereof. Had this proviso been repeated in the proposal (since adopted), it is manifest no real question could have arisen as to the intent of the amendment to free the contemplated seaport improvement from both the prohibition against engaging in such works and that forbidding the loan of the state's money or credit in aid of such works. In reconstructing the proposal the Legislature introduced two exceptions, so expressly named; this to take from without the respectively antecedent prohibitory clauses such special cases or instances "as," in the first exception, "may be authorized by the

Constitution of Alabama or amendments thereto," and "as," in the second exception touching private or corporate enterprises, "may be *expressly* authorized by the Constitution of Alabama or amendments thereto." (Italics supplied.) Since the same Legislature framed both the proposal of 1919 and that of 1921 and were, in each instance, treating the same subjects, it is natural to suppose that a similar intent characterized each effort, except where, as in the limitation of cost, a different, tho ancillary, purpose was expressed. The omission from the last, the adopted proposal, of the proviso declaring inapplicable the foregoing prohibitions and the insertion of the exception (the first) in the 1921 proposal evinces a degree, at least, of persistence in the legislative mind of the idea set forth in the proviso (in the 1919 proposal) declaring inapplicable to seaport development the foregoing prohibitions, necessarily including therein that forbidding the employment of the state's credit in aid of that internal improvement. The first exception's reference is to all therein preceding prohibitions restraining the state; but the exception's scope and effect is confined to such instances or occasions "as may be authorized by the Constitution of Alabama or amendments thereto." A comparison of this exception with the second exception, that introduced with respect to private or corporate enterprises, discloses that in the second instance the authorization is required to be expressly made, while the first exception, relating to the state's action, is not conditioned upon an express authorization, to the end stated. The omission to exact express authority, in Constitution or amendments thereto, as the condition to the operation of the first exception, while requiring express authority as the condition to the operation of the second exception, relating to private or corporate enterprises evinces a discriminative intent to admit a character of authorization not necessarily express, in respect of internal provement by the state, that would not suffice to answer the requisite prescribed in the second exception. So the first exception is met, may be invoked by an authority that is implicable from provisions in the Constitution or amendments thereto. It is not to be supposed that in so phrasing the proposal the Legislature, or the electorate in voting thereupon, did not intend to prescribe a different expression and measure of authority in the two instances, one purely public and the other private or corporate, when exacting express authority in the latter instance and only authority in the former.

Does the amendment's provisions relating to seaport development evince an intent to free that internal improvement from the prohibition against the employment of the state's credit within the purview of the first exception, as we have interpreted it? A contrasting of the amendment's provisions authoriz-

ing the construction, etc., of public highways and bridges with the provisions authorizing seaport development requires affirmative response to the inquiry last stated. To provide efficient public highway and bridge facilities, the sole authorization is to appropriate funds; whereas to accomplish seaport development the authorization takes the unmistakable form of a conference on the Legislature of the power "by appropriate laws" to authorize the state to engage in the work of developing, operating, etc., seaports within the state. In respect of public highways and bridges the sole authority given by this amendment is to pass laws appropriating funds. In respect of seaport development, etc., the authorization expressed in this amendment is to enact laws appropriate to the state's engaging in such work of internal improvement and operating the same under the exclusive management of the state or its governing agency. The power to enact laws appropriate to effectuate seaport development invests the Legislature with a discretion in the creation, use, and employment of methods, measures and means that, so far as this amendment is concerned, is only restrained by the two limitations set forth in the amendment, namely, that the cost shall not exceed $10,000,000, and that the improvement shall be and remain under the management and control of the state or an agency created by it. Any other construction of the amendment's provisions for seaport development would involve the obviously unsound process of reading to identical purposes and effects terms that simply authorize, for highway and bridge construction and maintenance, the appropriation of funds and terms that, to consummate a seaport development and operate this public facility, invest the Legislature with the stated discretionary power to enact appropriate laws to accomplish the state's engagement in seaport development and the operation of the facility under the exclusive control of the state or an agency of its creation. The material difference in the amendment's treatments, authorizations of the two internal improvements— highways and bridges, on the one hand, and seaport development and operation, on the other—leave in no degree of doubt that the framers of the amendment did not intend that the method, measures, or means to effect the former public purpose were those and those only permissible to accomplish the latter public purpose.

Such being the indubitable effect of the amendment's provision for seaport development, it operates, under the terms of the first exception in the amendment, to afford the essential condition and to qualify the antecedent prohibition against the employment or loan of the state's money or credit in aid or effectuation of the seaport development contemplated, thereby completely excepting, exempting such development from the restraint that inhibition would otherwise have interposed.

From this construction of the amendment it results, necessarily, that by force of the terms of the amendment, in its phrase authorizing seaport development, distinct inconsistency, repugnancy to the general provision of section 213 inhibiting the creation or incurring of a "new debt" by the state, except in the presently unimportant circumstances therein prescribed, is introduced. The discretionary power, in the special instance of seaport development, having been conferred on the Legislature to enact appropriate laws to accomplish seaport development—including, through the stated first exception, the exemption of such seaport development from the antecedently defined restraint against the employment of the state's credit—introduces into the Constitution the authority to employ the credit of the state to effectuate the public purpose; and the borrowing of money, the creation of debt, evidenced by bonds or otherwise, is a method and measure for the use or employment of the state's credit so committed by this amendment to the discretion of the Legislature to be exercised by the enactment of laws appropriate to the purpose and ends contemplated.

This amendment is the last expression of public will, upon a special subject of consideration and constitutionally invoked judgment in the premises. It must prevail over, operate a repeal or modification of any other inconsistent or repugnant elder provisions in the Constitution, to the extent such inconsistency or repugnancy exists. 12 C. J. p. 724, § 96; Mayor, etc., v. Stonewall Ins. Co., 53 Ala. 570, 577; State v. Birmingham Southern Ry. Co., 182 Ala. 475, 491, 62 South. 77, Ann. Cas. 1915D, 436.

This provision for seaport development in this amendment accords special, exceptional treatment to that particular subject. In respect of such development, the amendment introduces into the Constitution provisions special in design and character, as distinguished from general provisions, of which class the broad prohibition, inhibiting the creation or incurring of "new debts" declared in section 213, is an apt illustration. When general and special provisions of a Constitution—a fortiori where the special provision is introduced by amendment to the Constitution—are inconsistent or repugnant, special provisions must be accorded operation and effect to the extent of their scope, leaving the general provisions to apply to instances or occasions to which the special provisions are inapplicable. 12 C. J. p. 709.

The doctrines stated are invoked, their application required by the special provisions of this amendment to the Constitution with respect to seaport improvement when con-

trasted with the general provisions of section 213 of the original Constitution prohibiting (with presently unimportant exceptions) the creation or incurring of "new debts." The amendment, in the particular that it treats the special subject of seaport development, removes that character of internal improvement, together with the means, money, and credit, the Legislature, in its discretion, may employ, from the general inhibition of section 213 of the Constitution.

The only argument, seriously proposable, in opposition to the views prevailing with the Justices signatory to the responses and to this opinion is predicable of this theory; amended section 93 of the Constitution—in which both highway and seaport improvements are treated—refers in such terms to another or other proposals to amend the Constitution formulated and submitted at that special session (1921) of the Legislature that the "Road Bond Amendment" (Acts, Sp. Sess. 1921, pp. 36, 37), providing for highway, etc., improvement, is to be considered in pari materia with the so-called Port Amendment; and that, when considered in that relation, no satisfactory explanation appears for the Legislature's express provision for bond issues to accomplish highway improvement and the absence of such express provision for seaport development; wherefore it should be concluded that in the one instance (highway improvement) credit employment, through bonds, was the intent, and in the other (seaport development) no such intent was entertained, it not being expressly avowed.

The argument is untenable. If, as has been stated upon what appear to be conclusive considerations, the Port Amendment expresses the intent ascribed to it, acceptance of the theory summarily recited would involve the ignoring or repudiation of the conceptions that a contrasting of the amendment's provisions for highway improvement with those, materially, fundamentally different, introduced to authorize seaport development, inescapably impresses; a process that would admit the merely argumentative to overbear and neutralize the more emphatic, impressive exceptional terms employed in this amendment to authorize seaport development. The conclusion required, as already stated, by the different authorizations in the two exceptional, special circumstances (highway improvement and seaport development)—differences that are manifest and actual, not simply inferable or deducible—is founded in impressive fact, and not, as the recited theory would propose, in inference or deduction only. Doubtless the addition to the Constitution of the distinct article 18—the road bond article—was suggested by the design to afford more definite, adequate treatment to the subject of highway improvement, because, among other reasons that might be advanced, of the desire to place beyond all doubt or cavil

thereafter the securing for the state's highway system the advantage of federal aid to highway construction, etc., provided by the act or acts of Congress mentioned in the Alabama act, adopted at the same special session, approved October 31, 1921. Acts, Sp. Sess. 1921, p. 54 et seq.

The foregoing are the conclusions upon which the individual Justices, signing below, affirm the validity and effect of the Advisory Opinion Act and respond as respectively specified to the several questions propounded by the Governor on the 20th day of February, 1923.          . JOHN C. ANDERSON,
Chief Justice.
THOS. C. McCLELLAN,
ORMOND SOMERVILLE,
LUCIEN D. GARDNER,
WILLIAM H. THOMAS,
Associate Justices.

### Minority Response.

June 9, 1923.

Hon. William W. Brandon, Governor of Alabama, Capitol:

The undersigned Justices of the Supreme Court beg leave to assure you of our great deference and respect and of our entire willingness, within the limits which we conceive to be imposed by judicial practice and constitutional law, to contribute any effort of ours that would tend to create confidence in the constitutional validity of important acts of the Governor and the Legislature. But we must beg leave to say that in our opinion the Legislature in passing the act under which questions are propounded to the Judges has overlooked or misconstrued that paramount principle of American constitutional government which ordains the distribution of the powers of government among separate bodies of magistracy, the legislative, the executive, and the judicial, and commands that each shall confine its activities within its own sphere, and that the act tends to impair the authority of judicial decisions.

We assume that your inquiries are propounded with a view to further action by the Legislature on the subject of legislation authorized, but not required, by the Port Amendment, for, until some such action shall be taken, there can be nothing to be affected by executive action. Looking then through form to substance, we think these questions may be fairly epitomized as follows: If the Legislature should pass an act authorizing the issue of bonds under the Amendment, is it your opinion that the Supreme Court will uphold its constitutionality?

We note at the outset that this act shows a recession from its prototype in the Constitution of Massachusetts. In the Massachusetts Constitution the Legislature and the Governor are authorized to "require" the opinions of the Judges upon "important questions of law and upon solemn occasions." In

this act of ours it is said that the Governor or either House of the Legislature by a "request" in writing may obtain the written opinion of the Justices on important constitutional questions. If this act is to be construed merely· as an indorsement of the practice now sought to be established; that is, as merely declaratory of the judgment of the Legislature that such a practice is proper, and not as an enactment of positive law, then we state our opinion that the Legislature is wholly without power to impose its judgment in the premises on any co-ordinate branch of the government. Each branch has the legal and moral right to decide such questions for itself. And as for the individual Judges, there is nothing more involved than a question of propriety which each has the right to decide for himself. By propriety we mean of course official propriety, to be determined with a view to the spirit of the Constitution and the practice of the several departments of the government. In this aspect of the act of the ,Legislature we can do no better than quote a statement of the objections to the practice of consulting the Judges thus formulated by some )of the ablest jurists this country ever produced, Chief Justices Parker and Shaw, Judge Story, Ex-President John Adams, Daniel Webster, and others of their class:

"First, each department ought to act on its own responsibility. Second, Judges may be called on to give opinions on subjects which may afterwards be drawn into judicial examination before them by ¦contending parties. Third, no opinion ought to be formed or expressed by any judicial officer affecting the interest of any citizen but upon full hearing according to law. Fourth, if the question proposed should be of a public nature, it will be likely to partake of a political character; and it highly concerns the people that judicial officers should not be involved in political or party discussions." Mass. Convention, 1820. p. 629, as quoted in 24 Am. Law Review, p. 392,

· · It is impossible to read the opinions of the courts throughout the country without coming to the conclusion that the attitude of the· judiciary generally has been unfavorable to the practice even in those states where it is expressly permitted by their Constitutions. They say, to quote one of them, that "the general and abstract question, whether an act of the Legislature be unconstitutional, cannot with propriety be presented to a court." Foster v. Com'rs of Wood County, 9 Ohio St. 543. If the Legislature may in this way obtain advisory opinions on any subject, it may, as the practice develops, obtain such opinions on all subjects, great or small, speculative or concrete, for the Legislature has defined the limits of such requests for itself and may hereafter again define them according to its own pleasure. The Legislature may with equal right and propriety summon the judges daily to appear at the bar of the House and Senate there to answer questions, for that, in effect, though by indirection, is what is now done in this case. We cannot believe that the possibility, of any such practice with any such results can be justified.

If, on the other hand, this act was intended to have the force and effect of law, if the Legislature, in the exercise of its lawmaking power under the Constitution, may authorize itself to request the Justices of this court to render opinions after this fashion on constitutional questions, then the request is the moral and legal equivalent of an authoritative demand, and the Justices have no alternative but to respond. The legal right to make a request necessarily implies the right to a reply; and thus the Legislature has decreed an increment of power to itself under the Constitution. This, we think, the Legislature cannot do. No more can the Legislature confer upon the Executive or other heads of department the power to impose upon the courts or Judges duties which the Legislature itself cannot impose upon them.

We scarcely think what has been done in England is of any consequence in this connection, for we live under a different form of government, the central idea of which is that its functions are distributed into three distinct and independent branches, "to the end," quoting section 43 of the Constitution, "that it may be a government of laws and not of men." No such idea obtains in England. Nevertheless, broadly speaking, it has always been considered irregular for Judges in England to render opinions regarding hypothetical causes or in feigned controversies. 4 Am. & Eng. Ency. Law (2d Ed.) 1065. Nor can reference to those six states which follow the example of Massachusetts, by providing in their Constitutions for advisory opinions, help the act of the Legislature in this case, for the people of each state put what they please in their Constitutions, and in this state as in forty others, the people in their wisdom have omitted any such provision. Such a provision appeared for a time in the Constitution of Missouri; but the people put it out. So in Vermont by statute for a time; but the statute was repealed. Such a practice prevailed in Nebraska for a time; but the Supreme Court passed a rule that it would answer no more questions. Even in these states which have a provision of the sort in their Constitutions the practice has been looked upon with disfavor by the Judges and has been narrowly construed, and we find that in all the cases in which the question has been mooted the courts have held that the clause, common to the Constitutions of the American states, which requires the ' separation of governmental powers, assigning those which are legislative to one body of magistracy, those which are executive to another, and those which are judicial to another, by necessary implication prohibits the rendition ·of

advisory opinions, unless other clauses expressly authorize them. 4 Am. & Eng. Ency. of Law (2d Ed.) p. 1067; 12 C. J. 883. Thus the Supreme Court of Minnesota, referring to an act like unto that here in question, said:

"It constitutes the Supreme Court the advisers of the Legislature, nothing more. This does not come within the provisions of the Constitution, and, as the Constitution now stands, would be, in our opinion, not only inconsistent with judicial duties, but a dangerous precedent," and more to the same effect. 10 Minn. 78 (Gil. 56).

And the Supreme Court of Ohio:

"The division of the powers of the state into legislative, executive and judicial, and the confiding of these powers to distinct departments, is fundamental. It is essential to the harmonious working of this system that neither of these departments should encroach on the powers of the other. If the judiciary were to assume to decide hypothetical questions, of law not involved in a judicial proceeding in a cause before it, even though the decision 'would be of great value to the General Assembly' in the discharge of its duties, it would, nevertheless, be an unwarranted interference with the functions of the legislative department that would be unauthorized, and dangerous in its tendency. * * * Even under such a provision [as appears in the Constitution of Massachusetts] the judiciary must confine itself to an opinion on such questions as are involved in or necessary to the discharge of a public duty by the inquiring body. This power does not include the right to require an opinion on abstract or hypothetical questions however valuable as a future guide, nor to such questions as affect private rights merely. Opinion of the Justices, 122 Mass. 600; 126 Mass. 557." State v. Baughman, 38 Ohio St. 455.

"In the United States no such duty attaches to the judicial office in the absence of express provision of the Constitution (Dinan v. Swig, 223 Mass. 516, 519; Opinion of Court, 62 N. H. 704, 706; Rice v. Austin, 19 Minn. 103)." Matter of State Industrial Com., 224 N. Y. 16, 119 N. E. 1027.

There are other cases to the same effect. There are none to the contrary. If it be said that in some cases in which the courts have denied the right to advisory opinions such opinions were sought from the court and not, as here, from the Judges, we beg leave to say that in our opinion the suggested discrimination is illusory and unsubstantial, and that the cases amply show the discrimination to be unsound. The suggestion seems to admit, however, the constitutional impropriety of, an advisory opinion by, the court. We think the suggested difference between opinions by the courts and by the Judges rests upon a distinction without a difference. It rests upon a difference in the mere form of words. According to an universally recognized principle of law there could be no decision by the court in a case like that now presented. There is no jus-

ticiable question because, until the Legislature passes an act authorizing the issue of bonds, there can be nothing to decide. The function of the court is to decide controverted questions of law and fact. Its jurisdiction depends on real parties and a real subject-matter. It will engage in no speculations. Hughes on Procedure, 612, 613. True, what may be said by the Judges on this occasion, will not establish res judicata—there is nothing to be adjudicated in the ordinary sense—but it is clear nevertheless that our opinions are sought, not merely because we are required, to be learned in the law, that qualification might be found elsewhere.

And it is a fact also that we hold responsible positions under the Constitution and laws, of Alabama and that, as long as human nature remains what it is, the opinions of a majority of us will very definitely foreshadow the decision of the court in the event a lawsuit should hereafter arise involving the same question.

Not for a moment will any one concede that the opinions we now render will lack in any respect or degree the sanctions of our consciences and our oaths of office. Clearly, therefore, what the Justices of the court may say will be in the nature of a judicial judgment and will rest, so far at least as we are concerned, upon the like sanction as the most formal acts of the court. And may we not add that in the decision of the questions here presented we have observed no variation from the customary methods of procedure in this court. It is fair to assume—indeed, it is necessary to assume—that the opinions we now give on the meaning and effect of the Port Amendment will not only influence legislative action, but will constitute a moral obstacle, practically insuperable, in the circumstances, to stand in the way of a free and unbiased decision should the question now propounded hereafter recur in the course of litigation the court will be bound to decide. It is just such contingencies and possibilities the Constitution is intended to prevent.

In the federal courts it has been held from the earliest period:

"That by the Constitution of the United States, the government thereof"—like the government of the state of Alabama in this respect—"is divided into three district and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either; that neither the legislative nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial and to be performed in a judicial manner." Hayburn's Case, 2 Dall. 409, 1 L. Ed. 436.

Much store seems to be placed by the decision in Fox v. McDonald, 101 Ala. 51, 13 South. 416, 21 L. R. A. 529, 46 Am. St. Rep. 98. In that case the court labored at great length to establish the proposition that the

power to appoint to office is not inherently an executive function, but by the policy of our government has been distributed among the several departments of the state; in other words, that the Legislature might pass an act requiring the judge of probate to appoint police commissioners for the city of Birmingham. Except that, arguendo, the court conceded the constitutional distribution of powers to which we have referred, we fail to see how its opinion in that case has any bearing on the question of which we have undertaken to state our consideration. If, as the court decided—and there is no cause or occasion to question the decision— any department of the state government may appoint to office, then it seems obvious to us that an act lodging the power to appoint in a judge does not impinge upon the Constitution, and the decision to that effect seems to us to shed no light upon the question whether the Legislature or the Executive may demand opinions as this act undertakes to provide.

For the reasons thus stated, briefly and imperfectly—for we have been constrained by the consideration of proper time and space in which to state them—the undersigned, with great deference and respect, beg to be excused from further consideration of the questions you have propounded until they may be presented and argued by counsel in the ordinary course of the administration of justice.　　　A. D. SAYRE.
　　　　　　　　　　　　　B. M. MILLER.