The Honorable Bob Riley
Governor of Alabama
State Capitol
Montgomery, AL 36130
Dear Governor Riley:
We have received your letter requesting an advisory opinion as to whether the swap agreements House Bill 817 authorizes the State and certain Authorities[1] to enter *376 into would violate state constitutional provisions prohibiting the creation of new debt by the State. Section 12-2-10, Ala. Code 1975, authorizes the governor to request an advisory opinion from this Court. It provides that “[t]he Governor, by a request in writing, or either house of the Legislature, by a resolution of such house, may obtain a written opinion of the justices of the Supreme Court of Alabama or a majority thereof on important constitutional questions.”

The Nature of an Advisory Opinion

The Legislature is the original arbiter of the constitutionality of proposed legislation. Opinion of the Justices No. 380, 892 So.2d 332, 333 (Ala.2004). Additionally, “this Court gives great deference to the presumption of constitutionality afforded an act of the Legislature.” Opinion of the Justices No. 380, 892 So.2d at 333; see Town of Brilliant v. City of Winfield, 752 So.2d 1192, 1201 (Ala.1999).
Advisory opinions are not issued by the Court as a whole, but rather by the individual Justices. Opinions of the Justices No. 1, 209 Ala. 593, 594, 96 So. 487, 489 (1923). In issuing an advisory opinion, the members of this Court consider the question submitted without the benefit of briefing from adverse parties. Were we deciding an actual case or controversy, with opposing arguments and briefs, we might reach a different conclusion than the conclusion reached in this advisory opinion. See Opinion of the Justices No. 188, 280 Ala. 692, 703, 198 So.2d 269, 280 (1967)(“ ‘[Ajdvisory opinions given do not conclude or vindicate any right or remedy, result in no judgment or decree, bind no one whatsoever.’ ”) (quoting Opinions of the Justices No. 1, 96 So. at 489). Thus, pursuant to Ala.Code 1975, § 12-2-10, we undertake to offer our opinion as to the following question you have submitted:
‘Whether the State’s entry into one or more swap agreements, and options related to such swaps, under the proposed legislation and in connection with the refunding of outstanding bonds issued under Amendments 510, 618, 619, and 666 of the Alabama Constitution of 1901 would create a debt of the State in violation of Section 213 of the Alabama Constitution, as amended.”

Prohibition Against Creation of New Debt

Section 213 of the Alabama Constitution of 1901, as amended by Amendment No. 26, provides, in pertinent part:
“After the ratification of this Constitution, no new debt shall be created against, or incurred by this state, or its authority, except to repel invasion or suppress insurrection ...; (provided, further, that this section shall not be so construed as to prevent the issuance of bonds for the purpose of refunding the existing bonded indebtedness of the state....) Any act creating or incurring any new debt against this state, except as herein provided for, shall be absolutely void.”
This Court has defined “debt,” as that term is used in § 213, as “that which the state in any event is bound to pay, an obligation secured by the general faith and credit of the state.” Alabama State Bridge Corp. v. Smith, 217 Ala. 311, 316, 116 So. 695, 699 (1928) (emphasis added). Most often, such obligations are incurred in the form of general obligation bonds issued by the State. See generally Opinion of the Justices No. 316, 665 So.2d 1357 (Ala.1995); Edmonson v. State Indus. Dev. Auth., 279 Ala. 206, 184 So.2d 115 (1966).

House Bill 817

House Bill 817, as enrolled, contains the following legislative findings:
*377 “The Legislature finds and declares that existing state law authorizes the State and certain political subdivisions and public authorities of the State to enter into financial derivative transactions such as interest rate swaps, interest rate cap agreements, interest rate floor agreements, interest rate collar agreements and other similar agreements, including options to enter into such agreements. The Legislature also finds, declares, and confirms that when entered into by the State or its political subdivisions, such agreements do not constitute debts of the governmental entity for the purposes of the Alabama Constitution provisions limiting or proscribing the incurrence of debt by such entities. The ability to utilize interest rate swaps and similar transactions frequently requires the governmental or public entity to refund certain of its outstanding indebtedness at times and on terms that correlate with the terms and provisions of the swap or other agreement. The Legislature intends, by the passage of this act, to provide the State and the Authorities[2] additional flexibility in the issuance of refunding bonds and the management of their financial affairs.”
(Emphasis added.)
Following this recitation of findings, the bill provides that the State may enter into swap agreements, as defined in Ala.Code 1975, § 41-1-41. After reviewing the Governor’s analysis, as well as the relevant caselaw, we answer the question in the negative.
When the Alabama Constitution was ratified, the State had certain outstanding debt on previously issued bonds. Section 213 of the Constitution prohibits the creation of new debt, but explicitly permits the State to call old bonds and to “refund” the underlying debt by issuing new bonds. The State owes interest at a fixed rate on the bonds it issues. Market principles dictate that the State should refund a series of bonds if interest rates decline. Over time, the lower interest costs resulting from refunding State-issued bonds at a lower rate could save the State significant sums of money. House Bill 817 is intended to enable the State to achieve a similar result in a shorter period. It allows the State, under certain favorable market conditions, to enter into an interest rate “swap agreement.”[3]
As presented to us in the request for this advisory opinion, the manner in which such a swap would occur is as follows. The State would offer to sell an option to the counterparty. The option would give the counterparty a predetermined time frame in which to decide whether it wanted to enter into a swap agreement. If the counterparty accepted the offer, the coun-terparty would pay the State a cash premium to hold the offer open. If during the option period the counterparty chose not to exercise the option, the counterparty would lose its right to enter into the swap agreement, and the State would retain the premium.
However, if during the option period the counterparty chose to exercise the option, ■the State would be obligated to enter into the swap agreement. The State would call its fixed-rate bonds and issue refunding bonds on which it would pay a variable rate of interest. To compensate for the variable interest-rate payments to the holders of the bonds being refunded, the *378 counterparty would be obligated to pay the State at that same variable rate of interest. The State would then pay the coun-terparty at a fixed rate of interest.
As the Governor’s letter explains, if the State and the counterparty enter into a swap agreement, the State’s fixed-rate payments to the counterparty would be equal to its fixed-rate payments to the holders of the bonds if the State were simply to refund the bonds. However, the State would enjoy the benefit of a significant premium for providing the counter-party with the option.
There is the possibility that the swap agreement could be terminated early, in which event one or both parties may owe each other a sum representing a “termination payment.” This cost would be a market-driven cost the purpose of which is to set the parties at equilibrium with one another. In the event a swap agreement is terminated early, the State could be required to pay money or it may receive money.
Two points must be stressed. First, by entering into a rate swap agreement, the State issues no new bonds to fund the swap. Bonds are issued only to refund currently existing obligations, and a refunding of those obligations would probably occur regardless of the swap. In the past, “debt” has been viewed as “principal.” See Amend. No. 510, Ala. Const. 1901 (authorizing the issuance of bonds in “an aggregate principal amount not exceeding $20,000,000”); Amend. No. 618 (authorizing the issuance of bonds “not exceeding $52,000,000 in aggregate principal amount”); Amend. No. 619 (authorizing the issuance of bonds “not exceeding five million seven hundred thousand dollars ($5,700,000) in aggregate principal amount”); and Amend. No. 666 (authorizing the issuance of bonds “in an aggregate principal amount not exceeding $350 million”). The proposed swap agreement contemplates merely the payment of interest, not principal. Moreover, the legislation explicitly states that the transactions are not to be considered debt for purposes of the constitutional prohibition. We have previously deemed such a statement significant in finding that a transaction is not to be considered debt. Edmonson, 184 So.2d at 119.
Additionally, only one exchange of funds is certain to occur — the payment of a premium from the counterparty to the State. The remainder of the exchanges are contingent upon the counterparty’s decision to exercise the option. Upon the exercise of the option, the State will probably pay the exact amount under the swap agreement it would have paid under a simple refunding. Finally, the early termination of a swap agreement, while certainly possible, is rather remote.
We have emphasized that Section 213 of the Alabama Constitution, as amended by Amend. No. 26, is directed toward preventing the creation of an obligation that must be paid “in any event.” Alabama State Bridge Corp. v. Smith, 116 So. at 699. Yet whether the State pays any money under a swap agreement is a decision dependent upon the counterparty. Second, if the transaction is completed to fruition, there is no functional difference between an interest-rate swap and a simple refunding. Third, any fee that the State may have to pay upon early termination is so contingent that the State cannot fairly be said to be bound to pay that amount “in any event.” Because of the contingent nature of the payments, if any are required, we cannot say that they fairly constitute “new debt” as that phrase is defined in Section 213 of the Constitution.
*379 QUESTION ANSWERED.
Respectfully Submitted,
/s/ J. Gorman Houston, Jr. J. Gorman Houston, Jr. Acting Chief Justice
/s/ Harold See Harold See
/s/ Jean W. Brown Jean W. Brown
/s/ Douglas Inge Johnstone Douglas Inge Johnstone
/s/ Robert B. Harwood, Jr. Robert B. Harwood, Jr.
/s/ Thomas A. Woodall Thomas A. Woodall
/s/ Lyn Stuart Lyn Stuart Associate Justices

. Those authorities include the Alabama Public School and College Authority, the Alabama Corrections Institution Finance Authority, the Alabama Mental Health Finance Authority, the Alabama Judicial Building Authority, the Alabama Building Renovation Finance Authority, the Alabama Public Health Care Authority, and.the Alabama Incentives Finance Authority.

. See note 1.

. The process of "swapping” interest rates is increasingly common in today's financial markets. Many states are now taking advantage of this tool to hedge against risks and for other purposes.