KENNEDY, Justice
(concurring specially).
I concur in the well-reasoned opinion of the majority, but write specially in order to emphasize the following.
As a guiding legal document our state constitution is second only to the Constitution of the United States. This document, which serves as an expression of the will of the people of Alabama, is second to no act of the legislature, no opinion of the judiciary, and no executive order. Each branch of the government is constrained by the will and wisdom of this guiding document.
The twenty-sixth amendment to the Alabama Constitution of 1901 was proclaimed ratified over six decades ago. It amended § 213 of the constitution, and provides that (subject to exceptions not in issue here[2]) “no new debt shall be created against, or incurred by the state, or its authority.” As to any act that would do so, it provides: “Any act creating or incurring any new debt against the state ... shall be absolutely void.” (Emphasis added.) It has been said that § 213, as amended, in conjunction with § 44, prevents the legislature from enacting laws that would deplete funds necessary to meet the obligations of the state in the future. Opinion of the Justices, 252 Ala. 468, 41 So.2d 771 (1949).
I agree with the dissent that the public has an interest in industrial development, and that one of the primary purposes of the bill on which we have been asked to issue an advisory opinion is to promote industrial development. Indeed, nothing in the majority opinion suggests that this goal is anything but important, desirable, and laudable. It bears emphasis, therefore, that the problem presented by this bill is not that it promotes industrial development, but the manner in which that development would be funded. Such efforts cannot be funded in a manner directly contrary to the will of the people of the State of Alabama, as expressed by their constitutional mandate in § 213, as amended. Simply stated, funding is the issue here, not the primary goal of this bill, and clearly, there are numerous constitutionally acceptable alternatives to the unacceptable funding plan in this bill.
As to the unconstitutionality of the bill, I observe that the Court is not confronted with two possible constructions of § 213, and has simply chosen one over another. To the contrary, the Court is confronted with two inescapable conclusions: 1) Section 213 of the constitution forbids the state from incurring new debt, and 2) the bill binds the state to the payment, from an existing revenue source, of large sums of state money over the course of the next 30 years. This bill would cause the state to incur new debt, contrary to the mandate of § 213, as amended. With all respect, whether the sum to be paid is called an “appropriation,” a “payment,” or anything else, when one is bound to pay a sum of money to another, they have a “debt.” When that entity is the state itself, rather than, for example, a state corporation, and when that sum is to be paid over the course of many years from monies that would have flowed to our general fund, the state has incurred a new debt, which is generally forbidden by § 213, as amended.
In so stating, I recognize the argument of the dissent, that this case fits the standards identified in Edmonson v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966), as a situation where § 213 is not offended — where an act has not created a new debt of the state. The majority ably discusses Edmonson, and so I offer but one example of how, in my view, the dissent’s reliance on Edmonson is misplaced.
Specifically, the seventh identifying standard discussed in Edmonson provides that in order to survive the limitation on government of § 213, the act in question must not have *1365 “appropriated and pledged for the servicing of the bonds the receipts of a special tax which had not theretofore been paid into the general fund of the state.” 279 Ala. at 211, 184 So.2d at 120. Of course, here, the bill seeks to draw on funds that have heretofore been paid into the general fund of the state; therefore, it in no way meets this standard.
The dissent does not directly address this critical contradiction to its conclusion that the bill meets this Edmonson standard, but cites two cases, Opinion of the Justices No. 286, 407 So.2d 548 (Ala.1981), and McBurney v. Ruth, 527 So.2d 1265 (Ala.1988), and simply concludes that “[t]he bill meets this standard.” I have reviewed these two cases, and I note that neither ease elaborates on this standard, or for that matter, relates to the specific situation at hand. In Opinion of the Justices No. 286 the court was not examining a long-term, binding “appropriation,” and McBumey involved an act that would “appropriate” monies to a state authority from revenues raised pursuant to and subject to federal law.
It is not necessary for me to say that I believe the Court must engage in a strict construction of our constitution to ensure the rights of the people of this state. Here, under any construction, and despite any attempt to cloud the issues, the truth comes shining through. Section 213 speaks clearly of the mandate of the people.
Moreover, the people of this State have not only spoken clearly, but wisely. The working people of this state, its small business owners, its elderly, and its children, depend on an already strained general fund to provide the vital and necessary functions of government critical to their everyday lives. Who would question the wisdom of the people in forbidding a pledge of their present and future income with no provision for meeting their critical present and future needs in the absence of that income?
Finally, the dissent emphasizes the advisory nature of the opinion of the majority, and certainly no one would dispute that an “advisory” opinion is only that — advisory. It follows that a dissent to an advisory opinion does not represent the view of a majority of the members of the Court in any matter, advisory or otherwise.
MINORITY RESPONSE OF JUSTICES MADDOX AND HOUSTON
Members of the House of Representatives
Alabama State House
Montgomery, Alabama 36130
Dear Representatives:
Our dissent is based upon our interpretation of Amendment No. 450 of the Constitution of Alabama of 1901. Our interpretation, which differs from that of the other Justices of this Court, is based upon this Court’s well-established and time-honored standard of review when interpreting limitations upon legislative power.
Amendment No. 450 does not limit the power of the legislature to do what it purports to do by House Bill 586 (“the Bill”). The only limitation relevant to this advisory opinion placed upon the legislature by Amendment No. 450 is that “[t]he trust capital ... shall not be appropriated by the legislature.” In the Bill, the legislature does not appropriate any of the trust capital. In fact, if all of the words of Amendment No. 450 are given their legal effect, that amendment authorizes the legislature to do what it purports to do by the Bill. Amendment No. 450 provides that “any trust income derived [from the Alabama Trust Fund] shall be paid directly into the general fund as it is received by the board, subject to appropriation and withdrawal by the legislature.” (Emphasis added.)
The Bill, taken in its entirety, constitutes a complete procedure to enable a separate public corporation and instrumentality to fulfill outstanding commitments made by the State of Alabama for financial incentives to be granted to industries committing to locate in the State. More specifically, the Bill provides a means for financing training and manufacturing facilities for use by private industry through the issuance of bonds payable from interest earnings on investments of funds held in the Alabama Trust Fund created by Amendment No. 450 to the Constitution. The specific aspects of the Bill that relate to the questions propounded by the Resolution may be summarized as follows:
*1366 Sections 3, 4, and 5 of the Bill authorize the creation of “a public corporation and public instrumentality of the State” designated “Alabama Incentives Financing Authority” (the “Authority”). The incorporators, members, and directors of the Authority are the Governor, the commissioner of revenue, and the director of finance.
In Section 8(a), the Authority is empowered to issue its bonds (in a principal amount not to exceed $145,000,000) for the purpose of financing two types of projects: (1) facilities for use by industrial or research enterprises (referred to herein as “Manufacturing Facilities”) and (2) facilities to provide vocational, technical, or other training for industrial employees (referred to herein as “Training Facilities”) and, in connection with Training Facilities, fees payable as compensation for managing Training Facilities and costs of operating and maintaining Training Facilities. Questions (3), (4), and (5) propounded by the Resolution relate to the financing of Manufacturing Facilities and Training Facilities and management fees relating to Training Facilities. None of the questions propounded relates to operating expenses referable to Training Facilities. Although the Bill would permit the Authority to guarantee the obligations of other public corporations issued for the purposes described above, the questions propounded by the House of Representatives do not deal with any such guaranty.
Section 8(d) of the Bill provides that obligations of the Authority (which include its bonds) shall be payable from certain enumerated sources. Among the enumerated sources of payments are “appropriated funds” as defined in Section 2 of the Bill. “Appropriated funds” are specified amounts of the interest earnings on investments of the Alabama Trust Fund, payable over a period of 30 years, for the purpose of providing funds to enable the Authority to pay debt service on its bonds. In Section 8(d), the Authority is authorized, as security for payment of the debt service specified in said bonds, to pledge “appropriated funds.” Although the Bill permits the pledge of other revenues of the Authority, the questions propounded by the House of Representatives, insofar as they relate to the source of payment of the Authority’s bonds, deal only with appropriated funds; and the availability to the Authority of other revenues (e.g., rental income or the option price of facilities sold) would not affect the constitutional issues on which our opinion is sought. Section 8(d) of the Bill further provides that all obligations issued by the Authority “shall be solely and exclusively obligations of the Authority and shall not constitute or create an obligation or debt of the state.”
Sections 12(a)(3) and 12(a)(4) of the Bill effectively provide to the Authority two options in connection with the usage of any Manufacturing Facilities financed by the Authority. Under the first option, provided for in Section 12(a)(3), the Authority may lease such facilities to a private company under a lease that may require the payment of only nominal rent by the lessee. That subsection provides, however, that the lease agreement “shall not grant to the lessee any option to purchase the financed property at a price, determined as of the date of exercise of such option, less than the fair market value of the financed property and [that] any option to purchase such financed property granted to such lessee or any other person in such agreement or by separate instrument, whenever granted, at less than such fair market value shall be void and of no effect.” The first option is the subject of the third question propounded by the Resolution. Under the second option, set out in Section 12(a)(4) of the Bill as an alternative to the leasing arrangement described above, Manufacturing Facilities financed by the Authority may be acquired and held in the name of a private company, but only under an agreement containing the following provisions:
“a. The title to the financed property shall not be conveyed to any person other than the authority and shall, except as hereinafter provided, be conveyed to the authority free and clear of all liens and encumbrances and without the payment of consideration by the authority within 60 days after the date of which operation of the project by the approved company ceases.
*1367 “b. In lieu of such conveyance of title to the authority, the approved company may at its option pay the authority the fair market value of the financed property as of the date of cessation of operations and retain title to the financed property.
“c. The obligations of the approved company to the authority not to convey title to the financed property to any person other than the authority and to convey the financed property to the authority in accordance with the preceding paragraph a. shall be secured by the grant of a security interest in the financed property acceptable to the authority.”
The second option permits ownership of the financed facilities by the private user, but effectively immobilizes those facilities by requiring a continuous use, terminable only by transfer to the authority or payment to the Authority of fair market value.
With respect to the financing by the Authority of Training Facilities or management fees relating to such Training Facilities, Section 12(a)(5) provides in part:
“[T]he authority shall enter into an agreement with any person to provide for operation and management of a training facility by the person and to prescribe the terms and conditions upon which ... training facility management fees are to be paid or reimbursed by the authority from the proceeds of the bonds and, if the authority deems it to be appropriate, granting to the person an option to purchase such training facility at a price, determined as of the date of exercise of such option, equal to the fair market value of such training facility as of the date of exercise of such option, and any option to purchase such training facility granted to any person in such agreement or by separate instrument at less than such fair market value shall be void and of no effect.”
The Bill contemplates that Training Facilities financed by the Authority will be owned by the Authority and will be operated on the Authority’s behalf by another entity to which management fees may be paid, and prohibits the operator from obtaining title to the Training Facility except upon the payment of fair market value.
I.
“Do the provisions of Section 11 of H.B. 586 that constitute a continuing withdrawal and appropriation to the Authority of a portion of the interest on investments held in the Alabama Trust Fund (the ‘appropriated funds’) violate the provisions of Section 5(a) of Amendment No. 450 to the Constitution of Alabama of 1901?”
Section 11 of the Bill appropriates to the Authority specified amounts of the interest income from the Alabama Trust Fund created in Amendment No. 450 to the Constitution. The first question propounded by the Resolution relates to the propriety of this appropriation and withdrawal of interest income under the provisions of Section 5(a) of Amendment No. 450.
Amendment No. 450 is, on its face, plainly an effort to preserve intact a substantial portion of the proceeds of oil and gas capital payments received by the State in connection with offshore drilling rights. The amount transferred to the Alabama Trust Fund from that source pursuant to Section 4 of Amendment No. 450 and a portion of the interest as specified in Section 4(c) of the Amendment, together defined in Section 2 of the Amendment as “trust capital,” is beyond the power of the legislature to appropriate, withdraw, or otherwise encumber. Section 5(a) of the Amendment states as follows: “The trust capital shall be held in perpetual trust and shall not be appropriated by the legislature or expended or disbursed for any purpose other than [for investment].” (Emphasis added.) There is not, however, in Section 5(a) or elsewhere in Amendment No. 450, evidence of an intent to prohibit the legislature from withdrawing or appropriating directly from the Alabama Trust Fund interest earnings on investments in the Alabama Trust Fund. The language of Section 5(a) provides that “any trust income derived [from the Alabama Trust Fund] shall be paid directly into the general fund as it is received by the board, subject to appropriation and withdrawal by the legislature.” (Emphasis added.) Only “[t]he trust capital ... shall not be appropriated by the legislature.” (Emphasis added.)
*1368 The legislative finding and declaration in Section 11(a) of the Bill that the appropriation “is made pursuant to and in accordance with [Amendment No. 450] and ... the interest income on investments in the Alabama Trust Fund is not a part of the General Fund of the State until deposited in the General Fund” reflects a legislative interpretation, entitled to weight by this Court, that the legislature may appropriate such interest pri- or to its transfer to the General Fund. To read the phrase “subject to appropriation and withdrawal by the legislature” as a direction that interest income is subject to the legislature’s control only after it has been received in the General Fund renders this language useless as a mere truism about the powers of the legislature. It is clear that the provisions of Section 4(e) of the Amendment (now substantially eliminated by Amendment No. 543) practically restricted the ability of the legislature to withdraw interest income from the Alabama Trust Fund because of the requirement for reinvestment of certain percentages of the income. Beyond that, Amendment No. 450 has no restriction upon the legislature’s control of state funds, whether in the form of interest received by the Alabama Trust Fund or subsequent to its transfer to the General Fund. More specifically, the withdrawal and appropriation authorized in Section 11 of the Bill are pursuant to the legislature’s reserved right clearly expressed in Section 7 of Amendment No. 450 “to enact laws supplemental to this amendment and in furtherance of the purposes and objectives thereof, provided that such laws are not inconsistent with the express provisions of this amendment.” The appropriation that would be made by Section 11 of the Bill is not contrary to any express provision of Amendment No. 450 and is entirely consonant with the main purpose of that Amendment — to preserve intact the trust corpus.
The legislative findings in the Bill are similar to findings that Justices of this Court made 50 years ago in Opinion of the Justices No. 68, 247 Ala. 66, 69, 22 So.2d 521, 524 (1945):
“This Court has refused to place a limit on the police power of the State, because ‘it represents the state’s great reserve power, and is at all times coextensive with the necessities of the case and the safeguard of the public interest.’ Franklin v. State, 232 Ala. 637, [641], 169 So. 295, 298 [(1936)]. We have said that the police power ‘casts on the legislature the peculiar function of ascertaining and determining when the welfare of the people needs its exercise, that it is not paramount to the Constitution, yet its exercise is never interfered with unless plainly in conflict with the higher law.’ Pickett v. Matthews, 238 Ala. 542, [546], 192 So. 261, 264 [(1939)].
“Legislative power to regulate as well as to establish markets is recognized as being within the police power of the state. [Citations omitted.] It can hardly be denied that the public interest lies in the protection and promotion of agriculture. The welfare of the people is so inextricably tied up with agriculture, as to make its well-being a matter of governmental concern. It is sufficient to mention the need to increase prices of farm products in order to stimulate production and thus protect the food supply of the people. [Citation omitted.] This is a matter of common knowledge.”
The public interest in industrial development during the last 40 or 50 years parallels the public interest in agriculture that the Justices described in Opinion of the Justices No. 68, supra. The people of Alabama, in ratifying Amendment No. 450, intended to establish the Alabama Trust Fund, and they specifically restricted legislative power to appropriate or withdraw the principal of the fund, but they specifically said that the interest income was subject to appropriation and withdrawal by the legislature.
It seems obvious to us that one of the primary purposes of the Bill was to encourage and promote industrial development and the creation of jobs, and we do not believe that the plenary power of the legislature is somehow circumscribed by the provisions of Amendment No. 450, which specifically states that the interest income is subject to the power of the legislature to appropriate and withdraw.
*1369 In an amicus brief filed on behalf of the City of Tuscaloosa and the Tuscaloosa County Industrial Development Authority by Retired Justice Oscar W. Adams, Jr., J. Mark White, Robert W. O’Neill, and City of Tuscaloosa attorney Robert W. Ennis IV, counsel described the plenary power of the legislature as follows:
“The Constitution of Alabama of 1901 provides for three distinct branches of government, Art. Ill, § 42, and for a clear separation of powers among the three branches, Art. III, § 43. The Constitution states, ‘The legislative power of the state shall be vested in a legislature, which shall consist of a senate and a house of representatives. Art. IV, § 44.
“This Court has repeatedly stated that the Constitution has conferred on the legislature plenary powers that are restricted only by specific provisions of the State or United States Constitutions. In Young v. State, 283 Ala. 676, 680, 220 So.2d 843, 846 (1969), the Court stated, ‘The legislature has plenary power to pass any law on any subject it so desires except as restricted by the constitution, state or federal....’ In other cases the Court has held, ‘... the Constitution confers on the legislature plenary power to legislate except as restricted by the Constitution, State or federal....’ Ex parte Foshee, 246 Ala. 604, 606, 21 So.2d 827, 829 (1945); ‘Except insofar as specifically limited by the Constitution of Alabama and the Constitution of the United States, the full legislative power of the State is vested in the Legislature.’ Newberry v. City of Andalusia, 257 Ala. 49, 60, 57 So.2d 629, 637-38 (1952); and ‘It is well understood in this State that the legislature has plenary power to legislate except as that power is restricted by the Constitution either of this State or of the United States.’ Broadway v. State, 257 Ala. 414, 417, 60 So.2d 701, 703 (1952). See, also, Rogers v. City of Mobile, 277 Ala. 261, 281, 169 So.2d 282, [302] (1964); State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487 (1939); State ex rel. Brooks v. [Gullatt], 210 Ala. 452, 98 So. 373 (1923). As this Court said in Hall v. Underwood, 258 Ala. 392, 399, 63 So.2d 683, 688 (1953):
The rule is that except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operates according to natural justice or not in the particular case, [citation omitted], and that in determining the validity of an enactment, the judiciary will not inquire into the motives or reasons of the Legislature or the members thereof. The Judicial Department cannot control legislative discretion. [Citation omitted.] Further, a statute will be sustained as not violative of constitutional limitations on legislative powers, if with the aid of all reasonable intendments, it can be given effect without violation of the letter and spirit of the Constitution.’
[[Image here]]
“Any limitation expressed in the State Constitution, on the otherwise full scope of the legislative power, must be seen as an exception to this otherwise plenary power; and the effect of such a limitation can go no further than the expressed language or test of the limitation itself.
“Limitations on legislative power are therefore to be strictly construed against the restriction of that power. State v. Clements, 220 Ala. 515, 126 So. 162 (1930).
“ ‘Every presumption is in favor of the constitutionality of an Act of the legislature and this court will not declare it invalid unless, in its judgment, the Act clearly and unmistakably comes within the inhibition of the Constitution.’
“Rogers v. City of Mobile, supra, 277 Ala. at 274, 169 So.2d at 294-95. Furthermore, ‘[t]he burden is upon one who attacks a statute to maintain its unconstitutionality.’ State ex rel. Fowler v. Stone, 237 Ala. 78, 83, 185 So. 404, 408 (1939).
“In short, as this Court recently stated:
“ ‘This Court, when confronted with a choice between two possible constructions of a constitutional provision, one that would forbid the legislature to act and one that would permit the legislature to act, is not free to choose the construction that would restrict the legislature’s power.’
*1370 “House v. Cullman County, 593 So.2d 69, 80 (Ala.1992). (Emphasis added.)
“B. Standards applied by the Court in interpreting the plenary powers.
“In a number of cases, this Court has articulated the principles and criteria by which the Court reviews the constitutionality of legislative acts. In 1960, this Court stated:
“ ‘It is a fundamental principle of canonical construction, oft referred to, that all presumptions and intendments are indulged in favor of the validity of a statute, it being the recognized duty of the court to sustain an act unless convinced beyond a reasonable doubt of its unconstitutionality. [Citations omitted.] Or as stated in the City of Ensley v. Simpson case [166 Ala. 366, 52 So. 61 (1909) ], before an act of the legislature can be declared unconstitutional, it must clearly and unavoidably appear to have been without the power of the legislature.’
“Trailway Oil Co. v. City of Mobile, 271 Ala. 218, 221-22, 122 So.2d 757, 760 (1960).
“In Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 9-10, 18 So.2d 810, 814-15 (1944), the Court discussed ‘principles by which courts are guided when it is sought to strike down as violative of the constitution a legislative act’:
“‘Uniformly, the courts recognize that this power is a delicate one, and to be used with great caution. It shall be borne in mind, also, that legislative power is not derived either from the state or federal constitutions. These instruments are only limitations upon the power. Apart from limitations imposed by these fundamental charters of government, the power of the legislature has no bounds and is as plenary as that of the British Parliament. It follows that in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of the validity, and seek to sustain rather than strike down the enactment of a coordinate branch of government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clearly beyond reasonable doubt that it is violative of the fundamental law.
“ ‘... [T]he only question for the court to decide is one of power, not of expediency or wisdom.’
“Similarly, the Court opined:
“[T]he fundamental proposition [is] that validly enacted legislation is presumed to be constitutional. As we stated in Mobile Housing Board v. Cross, 285 Ala. 94, 97, 229 So.2d 485, 487 (1969):
“ ‘ “Every presumption is in favor of the constitutionality of an act of the legislature and this court will not declare it invalid unless in its judgment, the act clearly and unmistakenly comes within the inhibition of the constitution.” ’
“We will not invalidate a statute on constitutional grounds if by reasonable construction it can be given a field of operation within constitutionally imposed limitations. See Ex parte Huguley Water System, 282 Ala. 633, 213 So.2d 799 (1968).
“State Board of Health v. Greater Birmingham Ass’n of Home Builders, Inc., 384 So.2d 1058, 1061 (Ala.1980).
“This Court has used various phrases in applying the principles stated. It stated in re: Opinion of the Justices No. 106, 252 Ala. 559, 561, 42 So.2d 56, 58 (1949):
“ ‘[A]n inherent power of the legislature ... must not be arbitrary or unreasonable. However, the legislature has wide discretion and the act will not be held invalid unless it is clearly unreasonable and arbitrary.’ (Emphasis added.)
“The Court stated it a little differently in Crosslin v. City of Muscle Shoals, 436 So.2d 862, 863 (Ala.1983):
“ ‘It is the duty of courts to sustain the constitutionality of a legislative act unless it is clear beyond a reasonable doubt that it is in violation of the fundamental law. Brittain v. Weatherly, 281 Ala. 683, 685, 207 So.2d 667, 668-69 (1968).’ (Emphasis added.)
“The Court had earlier used the same expression when it stated:
*1371 “ ‘[0]ur solemn duty [is] to uphold a law, which has received the sanction of the Legislature, unless we are convinced beyond a reasonable doubt of its unconsti-tutionally_’ (Emphasis added.)
“Yielding [Yeilding] v. State ex rel. Wilkinson, 232 Ala. 292, 298, 167 So. 580, 585 (1936).
“The Court has viewed its role to try to sustain the constitutionality of a legislative act, if at all possible, as a duty.
‘“It is the duty of this Court not to strike down a statute as unconstitutional if by reasonable construction it can be given a field of operation within constitutional limits ... [a]nd it is the ... duty of this court to construe the statute involved in this mandamus petition to give it validity and remove any question of constitutionality, if possible.’ (Emphasis added.)
“Ex parte Huguley Water System, 282 Ala. 633, 639, [213] So.2d 799, 805 (1968). Likewise, this Court has stated that it should view any legislative act before it for consideration of its constitutionality with great liberality.
“‘The tendency of the courts, as the guardians and expounders of Constitutions, has been and is to accord to legislative action ... the utmost liberality that is possible, consistently with the preservation of the organic structure of their governments.’ (Emphasis added.)
“State v. [Vaughan], 30 Ala.App. 201, 203, 4 So.2d 5, 7 (1941).”
When this standard is given serious consideration, we can conclude only that the provisions of Section 11 of the Bill that constitute a continuing withdrawal and an appropriation to the Authority of a portion of the interest on investments held in the Alabama Trust Fund do not violate the provisions of Section 5(a) of Amendment No. 450 to the Constitution.
II.
“Do the provisions of Section 11 and Section 8(d) of H.B. 586, which, taken together, appropriate the appropriated funds to the Authority from the Alabama Trust Fund and authorize the Authority to pledge the appropriated funds for payment of its obligations, violate Section 213 of the Constitution of Alabama, as amended?”
The second question propounded by the Resolution inquires as to whether the issuance of bonds by the Authority that are secured by a pledge of moneys appropriated to the Authority from the interest income on the Alabama Trust Fund creates an impermissible debt of the State. Section 213 of the Constitution of Alabama provides that, subject to very limited exceptions, “no new debt shall be created against, or incurred by the state, or its authority.” Based upon earlier decisions of this Court, it is plain that because of the nature of the Authority, the nature of the bonds of the Authority, and the source of funds appropriated for payment of such bonds, the issuance of such bonds would not result in the creation of a “debt” of the State within the meaning of Section 213. Opinion of the Justices No. 169, 270 Ala. 147, 116 So.2d 588 (1959); Opinion of the Justices No. 286, 407 So.2d 548 (Ala.1981); McBurney v. Ruth, 527 So.2d 1265 (Ala.1988).
Edmonson v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966), is particularly compelling in connection with the issues raised by the Resolution, because it contains an analysis of earlier decisions under Section 213 and concerns a statute designed to further the industrial development of the State. Edmonson dealt with what is now codified as Ala.Code 1975, §§ 41-10-20 through 41-10-32, creating the State Industrial Development Authority (“Development Authority”) and authorizing that public corporation to issue bonds for the purpose of funding the preparation of industrial sites for use by private entities and the costs of surveys related to industrial development. Bonds of the Development Authority were required to be payable from certain taxes appropriated to the Development Authority. In holding that this financing plan did not violate Section 213 of the Constitution, this Court reviewed prior decisions and recognized seven similarities in the legislative acts that had been held to be in conformity with Section 213. These seven similarities are as follows:
*1372 “(1) Each [statute] provides that the bonds authorized to be issued thereunder shall not be general obligations of the issuing body but shall be payable solely out of the funds appropriated and pledged under the provisions of [such statute].”
279 Ala. at 211, 184 So.2d at 119.
The Bill meets this standard. Section 8(d) of the Bill provides: “Authority obligations shall not be general obligations of the authority.” Section 8(d) further provides that bonds of the Authority shall be payable solely from appropriated funds or other sources that effectively constitute internally generated funds not subject to any constitutional inhibition.
“(2) Each [statute] provides that the bonds authorized to be issued thereunder shall not constitute or create an obligation or debt of the State of Alabama.”
279 Ala. at 211, 184 So.2d at 119.
The Bill meets this standard. Section 8(d) of the Bill provides: “All contracts made and all authority obligations issued or incurred by the authority pursuant to this act shall be solely and exclusively obligations of the authority [though not general obligations] and shall not constitute or create an obligation or debt of the state.”
“(3) Each [statute] appropriates and pledges for accomplishment of the purposes thereof so much as may be necessary of receipts of an excise tax of the State of Alabama.”
279 Ala. at 211, 184 So.2d at 119.
Essentially, this is a requirement that there be a limited, identifiable source of appropriation, rather than a general charge against state funds. Although the appropriation under consideration in Edmonson and the other cases that are summarized by the seven similarities related to excise taxes, other statutes involving funds appropriated to a public corporation and tested against Section 213 have been upheld. In McBurney v. Ruth, supra, the statute appropriated to the Tennessee Valley Exhibit Commission of Alabama from the General Fund a portion of the payments made by TVA to the State in lieu of taxes. In Opinion of the Justices No. 286, supra, the appropriation was from the General Fund, but was limited to advance rentals from offshore drilling rights. Opinion of the Justices No. 286 and McBurney are in accord with a longstanding judicial interpretation of the basic intent of Section 213 to protect the State’s General Fund. The clearest statement of this interpretation is in Alabama State Bridge Corp. v. Smith, 217 Ala. 311, 316, 116 So. 695, 699 (1928), involving a pledge of gasoline taxes:
“Our judgment is that ‘debt,’ within the meaning, the purview, the whole content, of the constitutional provision, is that which the state in any event is bound to pay, an obligation secured by the general faith and credit of the state.... There is no promise on the part of the state [in the statute in question] to pay in any event; there is no pledge that there will be a surplus of any fund; there is no pledge of the general credit of the state; there will be no debt within the meaning of section 213.”
The funds appropriated to the Authority by Section 11(a) of the Bill have a limited source (the same ultimate source — payments for offshore drilling rights — as the appropriation considered in Opinion of the Justices No. 286, supra) and are taken from a special fund and are limited to earnings on investments.
The Bill meets this standard.
“(4) In none of the statutes was there any representation or agreement of any kind that there would ever be any receipts from the tax pledged or that the receipts, if any, would be sufficient to service the bonds.”
279 Ala. at 211, 184 So.2d at 119.
There being no representation or agreement of any type mentioned in the Bill, the Bill meets this standard. The appropriated funds constitute interest to be earned, with all the uncertainties associated with investment return.
“(5) In none of the statutes was there either a pledge of the faith and credit of the State or an agreement to pay the appropriation from any other funds if *1373 those appropriated should be insufficient to service the bonds.”
279 Ala. at 211, 184 So.2d at 119.
The Bill meets this standard, for there is a total absence of any undertaking to appropriate any funds to the Authority other than those specified in the Bill.
“(6) Each of the statutes authorized the use of proceeds of the bonds issued thereunder for a purpose of state-wide interest.”
279 Ala. at 211, 184 So.2d at 120.
The industrial development of the State was the purpose served by the statute under consideration in Edmonson and that is the purpose served by the Bill being considered by this Court. The Bill meets this standard.
“(7) Each of the statutes appropriated and pledged for the servicing of the bonds the receipts of a special tax which had not theretofore been paid into the general fund of the State.”
279 Ala. at 211, 184 So.2d at 120.
In Opinion of the Justices No. 169, 270 Ala. at 148, 116 So.2d at 590, this Court stated that a separate corporation could receive “revenues derived from rentals or like income or from special taxes,” without violating Section 213. In subsequent decisions, no violation of Section 213 was found where the appropriated funds were part of the General Fund but were from an identifiable source not constituting a tax. Opinion of the Justices No. 286, supra (appropriation from the General Fund of rentals from offshore drilling); McBumey v. Ruth, supra (appropriation from the General Fund of TVA payments). The Bill meets this standard.
The provisions of Sections 11 and 8(d) of the Bill, which, taken together, allow the legislature to appropriate certain funds from the Alabama Trust Fund to the Authority and authorize the Authority to pledge funds so appropriated for payment of its obligations, do not violate Section 213 of the Constitution.
III.
“Do the provisions of Section 12(a)(3) of H.B. 586, which, taken together with Sections 8(a), 8(d) and 11(a) of H.B. 586, authorize the financing by the Authority, through the issuance of bonds secured by a pledge of the appropriated funds, of industrial or research facilities that may be leased to a private entity (with an option granted to said entity to purchase at fair market value), violate the provisions of Section 93 of the Constitution of Alabama of 1901, as amended?”
Section 93 of the Constitution, in pertinent part, provides:
“The state shall not engage in works of internal improvement, nor lend money or its credit in aid of such ...; nor shall the state be interested in any private or corporate enterprise, or lend money or its credit to any individual, association, or corporation.”
In Knight v. West Alabama Environmental Imp. Auth., 287 Ala. 15, 246 So.2d 903 (1971), this Court considered the constitutionality of a statute authorizing a public corporation to finance the purchase of environmental equipment for use by private companies and others. Section 93 was held to be inapplicable, because “[ajll of the prohibitions of Section 93 ... are directed toward the State of Alabama ... and not to public corporations.” 287 Ala. at 19, 246 So.2d at 905. (Emphasis added.) Recognizing that Section 93 contains five prohibitions, this Court found each prohibition inapplicable by reason of the “separate entity” concept. 287 Ala. at 20, 246 So.2d at 906. What was authorized to be done was to be done by a separate public corporation, not by the State. Insofar as the statute in question authorized the creation of debt, this Court explicitly recognized that the considerations applicable in determining what is a debt of the State for purposes of Section 213 of the Constitution apply equally in determining the existence of a “debt” under Section 93. Knight relied extensively on Edmonson, which involved a statutory framework similar in all material respects to the Bill. The statutes construed in Edmonson involved (a) the creation of a separate public corporation, (b) an appropriation of State funds to that public corporation for the purpose of paying obligations incurred by the corporation, (c) a grant of power to the public corporation to pledge the *1374 funds so appropriated, and (d) a grant of power to the public corporation to apply the proceeds of its bonds to the improvement of properties to be used by private entities. Additionally, this Court in Edmonson mentioned the provisions of the statute in question (now codified as Ala.Code 1975, § 41-10-27) to the effect that industrial sites improved by grants from the public corporation may not be disposed of to a private entity for less than fair market value, and found that aspect of the statute to provide “adequate safeguards” against a violation of the prohibition against the lending of the State’s money or credit to private entities. 279 Ala. at 208, 210, 184 So.2d at 117, 119. Section 12(a)(3) of the Bill likewise contains a requirement for disposing of Authority-financed manufacturing facilities only at fair market value and, in this and all other respects, is in conformity with the rationale of Edmonson with respect to Section 93.
It is clear that any private entity entering into an agreement with the Authority in accordance with Section 12(a)(3) of the Bill will receive benefits from the agreement. Such benefits are irrelevant for purposes of Section 93 where they arise as a part of a commercial contract. In Rogers v. City of Mobile, 277 Ala. 261, 169 So.2d 282 (1964), a contract between the State Docks Department and a private company under which the company was to operate sugar refining facilities financed through dock revenues was upheld against the contention that the contract violated Section 93. With reference to private benefits received, this Court stated:
“When a contract of a public body is an ordinary commercial contract, with benefits flowing to both parties and a consideration on both sides, it is not a lending of credit by the public body. Otherwise [Section] 93 ... would prohibit any public body from entering into any contract where-under the other party gained any benefits whatever.”
277 Ala. at 278, 169 So.2d at 298.
Because the agreement contemplated by Section 12(a)(3) would not be entered into by the State, would contain adequate safeguards against an unlawful lending of the State’s credit, and would be a commercial contract with presumed benefits to both parties, the agreement would not violate Section 93.
The provisions of Section 12(a)(3) of the Bill, which, taken together with Sections 8(a), 8(d), and 11(a) of the Bill, authorize the financing by the Authority, through the issuance of bonds secured by a pledge of the appropriate funds, of industrial or research facilities that may be leased to a private entity (with an option granted to said entity to purchase at fair market value), do not violate Section 93 of the Constitution, as amended.
IV.
“Do the provisions of Section 12(a)(4) of H.B. 586, which, taken together with Sections 8(a), 8(d), and 11(a) of H.B. 586, authorize the financing by the Authority, through the issuance of bonds secured by a pledge of the appropriated funds, of industrial or research facilities to be owned by a private entity but with limitations upon the disposition of the financed facilities, violate Section 93 of the Constitution of Alabama of 1901, as amended?”
As previously noted, the Bill contains optional provisions — Sections 12(a)(3) and 12(a)(4) — for the use of Manufacturing Facilities financed by the Authority. The authorities cited in Part III of this dissenting opinion with respect to the inapplicability of Section 93 to the provisions for leasing and fair-market-value sale of the financed property in Section 12(a)(3) of the Bill apply with equal force to the provisions of Section 12(a)(4). The difference between the two sections has more to do with form than with substance, because in both cases the “adequate safeguards” mentioned in Edmonson are present. With respect to Section 12(a)(3), title to the property remains in the Authority, with authorization for its sale to the user only upon payment of fair market value. With respect to Section 12(a)(4), legal title to the financed facilities may be in the private user, but that user must either (a) continue the use of those facilities in connection with an approved project or (b) return the facilities to the Authority or pay to the Authority the fair' market value *1375 thereof. Further, the rights of the Authority are to be secured by a security interest in the financed facilities. The overall effect of Section 12(a)(4) is to restrict the use of the property to the intended purpose, with assurances that, if fair market value is not paid, the property will not be disposed of to any person other than the Authority.
Section 12(a)(4) of the Bill, which, taken together with Sections 8(a), 8(d), and 11(a) of the Bill, authorizes the financing by the Authority, through the issuance of bonds secured by a pledge of the appropriated funds, of industrial or research facilities to be owned by a private entity but with limitations upon the disposition of the financed facilities, does not violate Section 98 of the Constitution, as amended.
V.
“Do the provisions of Section 12(a)(5) of H.B. 586, which, taken together with Sections 8(a), 8(d), and 11(a) of H.B. 586, authorize the financing by the Authority, through the issuance of bonds secured by a pledge of the appropriated funds, of a training facility to be operated and managed by a private entity (with an option granted to said entity to purchase at fair market value) and of management fees to be paid to said entity, violate Section 93 of the Constitution of Alabama of 1901, as amended?”
The final question posed relates to the financing of Training Facilities and attendant fees. For the reasons set out previously in our discussion in Part III of this dissenting opinion, the provisions of Section 12(a)(5) are not within the prohibitions of Section 93. It should be noted that Section 12(a)(5) contemplates that any Training Facilities financed by the Authority will be owned by the Authority, will be operated on the Authority’s behalf under an operation agreement, and will remain the property of the Authority unless purchased at fair market value. With respect to Training Facilities, as with Manufacturing Facilities, it is the Authority, not the State, that is the financing entity, and no debt of the State is created by the financing.
Section 12(a)(5) of the Bill, which, taken together with Sections 8(a), 8(b), and 11(a) of the Bill, authorizes the financing by the Authority, through the issuance of bonds secured by a pledge of the appropriated funds, of a training facility to be operated and managed by a private entity (with an option granted to said entity to purchase at fair market value) and of management fees to be paid to said entity, does not violate Section 93 of the Constitution, as amended.
For the foregoing reasons, we respectfully dissent.
We also call the legislature’s attention to the fact that Edmonson was a litigated case, and this is a request for our individual opinions. The legal effect of advisory opinions as opposed to the legal effect of a litigated ease was succinctly discussed in Opinion of the Justices No. 289, 410 So.2d 388, 391 (Ala.1982):
“The statute authorizing the Justices of this Court to render advisory opinions was enacted into law in 1923. Code 1975, § 12-2-10 [see, Act No. 43, Acts of Alabama, 1923]. In response to the first request for an advisory opinion, the Justices of this Court carefully considered the constitutionality of that act, and in an opinion by Justice McClellan, concurred in by Chief Justice Anderson and Associate Justices Somerville, Gardner and Thomas, determined that such a procedure was constitutionally appropriate. See, Opinions of the Justices [No. 1], 209 Ala. 593, 96 So. 487 (1923). In that opinion, the majority opined the following:
“ ‘Interpreting the act according to its manifest effects, these conclusions must, of necessity, prevail: (a) [t]hat the act does not at all contemplate the advice or the advisory opinions of the Justices upon any matter relating to the wisdom, desirability, or policy of prospective legislative or executive action; (b) that the merely advisory opinions contemplated are those of the individual Justices, not of the Supreme Court of Alabama in its judicial capacity; (c) that specific inquiries, within the intent of the act, must involve or concern concrete, important constitutional questions upon matters or *1376 subjects of a general public nature, as distinguished from questions involved in the ascertainment or declaration of private right or interest; (d) and that responses to questions within the purview of the act are designed to be advisory, consultative only, not concluding or binding the Governor or the House or Houses propounding inquiries or the Justices responding thereto.’
“209 Ala. at 594, 96 So. 487 [at 488-89].
“A strong and well reasoned dissent by Associate Justices Sayre and Miller pointed out that the legislation authorizing advisory opinions was not for the purpose of helping the Legislature overcome constitutional deficiencies in legislation pending before the Alabama Senate and House of Representatives, but instead the substance of the requests would be: If the Legislature should pass this act, is it your opinion that the Supreme Court will uphold its constitutionality? They felt this would, in effect, constitute a constitutional ruling on a legislative enactment prior to its passage without the benefit of allowing the matter to proceed through the adversarial process envisioned by the separation of powers safeguards included in our Constitution. See, Opinions of the Justices [No. 1], 209 Ala. 593, 602-05, 96 So. 487 (1923). The minority further stated that ‘Each branch [of government] has the legal and moral right to decide such questions for itself.’ 209 Ala. at 603, 96 So. 487.
“Since that first opinion, the Justices of this Court have conscientiously responded to requests of the Legislature, as well as the Governor, for advisory opinions.
‘“These opinions are usually given in deference to the executive and legislative departments of the state in order to guide them in the proper dispatch of their duties and to protect the officers and departments of the state in the performance of their duties under enacted legislation or under stipulation of proposed bond issues, etc.’
“Opinion of the Justices [No. 160], 266 Ala. 370, 371, 96 So.2d 752, 753 (1957). See, also, Opinion of the Justices [No. 274], 394 So.2d 957, 959-60 (Ala.1981).
However, as has been pointed out many times, the procedure, as well as the advisability, of rendering advisory opinions is not without difficulty, particularly in view of the fact that the questions are presented outside the normal adversary system wherein pertinent facts from the record of a trial court would be presented, and the issues would be briefed by attorneys and most times orally argued before the Court.
“ ‘There are several reasons why the practice of invoking the merely advisory opinions of the Justices, in their individual capacities, cannot and will not operate to invite the Justices to prejudge concrete causes or proceedings that may later come to the Supreme Court for decision: First. Such merely advisory opinions must often pertain to important constitutional questions that never can or will come to the Supreme Court’s consideration and decision; this, to illustrate, in all cases where the Legislature or the Executive does no act projecting or raising the constitutional inquiry upon which an advisory opinion or opinions have been requested and given. Second. Since only one prejudiced by official act or action can invoke the courts to judicially determine a constitutional question, it cannot be at all certain that the subject of such advisory opinion will be presented for judicial determination in a cause or proceeding in the courts. Third. The decision by the Supreme Court upon the constitutional validity of a legislative enactment or of an act by the Executive always contains this important factor that is wholly absent in a response by the Justices to a request for a merely advisory opinion on the question, pending legislative or executive action, namely, that in judicially testing and determining the constitutionality of legislative or executive action the Supreme Court — in the discharge of its high and concluding judicial function— always enters upon such an inquiry with the presumption, suggested by the deference due from one department to another, that the other department has not ignored or violated the Constitution; and this judicial presumption requires *1377 the sustaining of legislative or executive act, unless its invalidity appears beyond a reasonable doubt. In the observance of the practice, this act establishes, responses by the Justices would not at all involve recourse to or recognition of the stated presumption pending action by the interrogator on the subject of the advice sought. In these circumstances, no evoking of the judgment of the Justices in advance of contestation of any constitutional question in the Supreme Court itself is or would be effected by the practice the act establishes.’
“209 Ala. at 598, 96 So. 487 [at 492-93].”
HUGH MADDOX J. GORMAN HOUSTON, JR. Justices

. Such an exception exists, for example, as to the creation of debts so that the state can “repel invasion or insurrection.”